No. 13-40317

# In the United States Court of Appeals for the Fifth Circuit

―――――――――――――

THE ARANSAS PROJECT,
*Plaintiff-Appellee,*

v.

BRYAN SHAW, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; BUDDY GARCIA, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; CARLOS RUBINSTEIN, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; MARK VICKERY, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; AL SEGOVIA, IN HIS OFFICIAL CAPACITY AS SOUTH TEXAS WATERMASTER,
*Defendants-Appellants,*

GUADALUPE-BLANCO RIVER AUTHORITY; TEXAS CHEMICAL COUNCIL; SAN ANTONIO RIVER AUTHORITY,
*Intervenor Defendants-Appellants.*

―――――――――――――

On Appeal from the United States District Court for the
Southern District of Texas, Corpus Christi Division

―――――――――――――

## APPELLANTS' BRIEF FOR STATE DEFENDANTS

―――――――――――――

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.]: (512) 936-1695
[Fax]: (512) 474-2697

JONATHAN F. MITCHELL
Solicitor General

JAMES P. SULLIVAN
EVAN S. GREENE
Assistant Solicitors General

*Counsel for Defendants-Appellants*

### CERTIFICATE OF INTERESTED PERSONS

No. 13-40317      *The Aransas Project v. Shaw et al.*

The undersigned counsel of record certifies that the following persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Party | Counsel |
|---|---|
| The Aransas Project<br><br>Plaintiff-Appellee | James B. Blackburn<br>Charles William Irvine<br>Mary B. Conner<br>BLACKBURN CARTER PC<br><br>Charles Patrick Waites<br>JOHNSON DELUCA KURISKY & GOULD, P.C.<br><br>David Alfred Kahne<br>John Jeffery Mundy<br>THE MUNDY FIRM PLLC |
| Bryan Shaw, Buddy Garcia, Carlos Rubinstein, Mark Vickery, Al Segovia<br><br>Toby Baker, Zak Covar, Esteban Ramos (to be substituted pursuant to FED. R. APP. P. 43(c)(2))<br><br>State Defendants-Appellants | Jonathan F. Mitchell<br>James P. Sullivan<br>Evan S. Greene<br>John R. Hulme<br>Mark L. Walters<br>Brian E. Berwick<br>Bryan Dwayne Snoddy<br>Cynthia Woelk<br>David Marshall Coover III<br>Matt Willis<br>OFFICE OF THE ATTORNEY GENERAL |
| Texas Chemical Council<br><br>Intervenor Defendant-Appellant | Christina Wisdom<br><br>Thomas H. Watkins<br>BROWN MCCARROLL LLP<br><br>Amy Leila Saberian<br>ENOCH KEVER PLLC<br><br>Kenneth R. Ramirez<br>LAW OFFICE OF KEN RAMIREZ PLLC<br><br>Rachel L. Noffke<br>DESHAZO NESBITT |

| Guadalupe-Blanco River Authority<br><br>Intervenor Defendant-Appellant | Aaron M. Streett<br>Molly Cagle<br>Evan A. Young<br>Carlos Romo<br>BAKER BOTTS L.L.P.<br><br>Bruce Wasinger<br><br>Edward F. Fernandes<br>Kathy Robb<br>Maida O. Lerner<br>Andrew J. Turner<br>Andrea W. Wortzel<br>HUNTON & WILLIAMS LLP<br><br>Mark H. Zeppa<br>LAW OFFICES OF MARK H. ZEPPA PC<br><br>J A Tony Canales<br>CANALES SIMONSON PC<br><br>Kathryn Snapka<br>THE SNAPKA LAW FIRM |
|---|---|
| San Antonio River Authority<br><br>Intervenor Defendant-Appellant | David W. Ross<br>LAW OFFICES OF DAVID ROSS PC<br><br>Edmond R. McCarthy Jr.<br>JACKSON SJOBERG MCCARTHY & WILSON LLP |

  /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Defendants-Appellants*

**STATEMENT REGARDING ORAL ARGUMENT**

This case has already been set for oral argument in August 2013. *See Aransas Project v. Shaw*, No. 13-40317, slip op. at 2 (5th Cir. Mar. 26, 2013) (per curiam). The State Defendants agree that the issues in this case are sufficiently important and complex to warrant oral argument.

# TABLE OF CONTENTS

Statement of Jurisdiction ................................................................ 2

Statement of the Issues ................................................................. 5

Statement of the Case ................................................................... 5

Statement of Facts ........................................................................ 9

Summary of the Argument ........................................................... 11

Argument ..................................................................................... 13

I.   State Officials Do Not Violate The Endangered Species Act By Issuing State-Law Permits ............................................................. 13

    A.   The Act Of Issuing A State-Law Permit To Draw Water From The San Antonio And Guadalupe Rivers Does Not "Take" An Endangered Species .................................................... 15

    B.   The Act Of Issuing A State-Law Permit To Draw Water From The San Antonio And Guadalupe Rivers Does Not "Cause" A "Take" Of An Endangered Species ........................................... 22

    C.   The Canon Of Constitutional Avoidance Requires This Court To Reject The Plaintiff's Construction Of The Endangered Species Act ............................................................................... 27

    D.   The First Circuit's Decision In *Strahan* Is Not Persuasive And Should Be Expressly Repudiated By This Court ..................... 31

II.   The Causal Link Between The Issuance Of Water Withdrawal Permits And Any Effects On The Whooping Cranes Is Far Too Attenuated To Qualify As Proximate Causation ................................................. 37

III.   The District Court Had No Authority To Order State Officials To Apply For An Incidental Take Permit ............................................. 42

IV.   The District Court's Ruling Violates The Eleventh Amendment By Purporting To Enter Declaratory And Injunctive Relief Against TCEQ ......... 44

Conclusion .................................................................................... 46

Certificate of Service .................................................................... 47

Certificate of Compliance ............................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alabama v. Pugh*, 438 U.S. 781 (1978) .......................................................... 45, 46

*Allen v. Wright*, 468 U.S. 737 (1984) ................................................................ 4

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) ............................ 24

*Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073 (D. Minn. 2008) ....................... 40, 44

*Animal Welfare Inst. v. Martin*, 623 F.3d 19 (1st Cir. 2010) .......................... 31, 43

*Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70 (D. Me. 2008) .................. 32

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995) .............. *passim*

*Bankers Trust Co. v. Mallis*, 435 U.S. 381 (1978) .................................... 2

*Bates v. Johnson*, 901 F.2d 1424 (7th Cir. 1990) ...................................... 3

*Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525 (7th Cir. 1988) ........................ 2

*Camreta v. Greene*, 131 S. Ct. 2020 (2011) ............................................ 32

*Ctr. for Biological Diversity v. U.S. Dep't of Housing & Urban Dev.*,
    359 F. App'x 781 (9th Cir. 2009) ................................................ 41

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466 (D.C. Cir. 2009) ............. 4

*The Civil Rights Cases*, 109 U.S. 3 (1883) ............................................ 24

*Clark v. Briscoe Irr. Co.*, 200 S.W.2d 674 (Tex. Civ. App.—Austin 1947, no writ) ......... 21

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ................................29, 30, 37

*Creedmoor-Maha Water Supply Corp. v. TCEQ*,
    307 S.W.3d 505 (Tex. App.—Austin 2010, no pet.) ................................ 21

*Defenders of Wildlife v. EPA*, 882 F.2d 1294 (8th Cir. 1989) ........................ 31

*Escambia County v. McMillan*, 466 U.S. 48 (1984) .................................... 27

*Exxon Co. v. Sofec, Inc.*, 517 U.S. 830 (1996) ...................................... 23

*Friends of the Earth, Inc. v. Crown Cent. Petrol. Corp.*, 95 F.3d 358 (5th Cir. 1996) ............. 4

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ................................ 3

*Green v. Mansour*, 474 U.S. 64 (1985) ................................................ 43

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................ 30

*INS v. St. Cyr*, 533 U.S. 289 (2001) ................................................................. 30

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ................................................ 4

*Local Union No. 1992, Int'l Bhd. of Elec. Workers v. Okonite Co.*,
    358 F.3d 278 (3d Cir. 2004) ......................................................................... 2

*Loggerhead Turtle v. County Council of Volusia County*,
    148 F.3d 1231 (11th Cir. 1998)................................................................ 32, 40

*Loggerhead Turtle v. County Council of Volusia County*,
    92 F. Supp. 2d 1296 (M.D. Fla. 2000) ........................................................ 32

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .......................................... 4

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................... 3

*Milofsky v. Am. Airlines, Inc.*, 404 F.3d 338 (5th Cir. 2005).......................... 33

*NLRB v. Catholic Bishop*, 440 U.S. 490 (1979) .............................................. 30

*New York v. United States*, 505 U.S. 144 (1992) .......................................... 28, 30

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ......................................................... 4

*Palila v. Haw. Dep't of Land & Natural Res.*, 852 F.2d 1106 (9th Cir. 1988) .......39, 40, 41

*Papasan v. Allain*, 478 U.S. 265 (1986) .......................................................... 43

*Parker v. County of Los Angeles*, 338 U.S. 327 (1949) .................................. 27

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ............... 43

*Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*,
    195 F.3d 975 (7th Cir. 1999)......................................................................... 3

*Pinkerton v. United States*, 328 U.S. 640 (1946)............................................ 19

*Poly-America, Inc. v. NLRB*, 260 F.3d 465 (5th Cir. 2001)............................ 19

*Printz v. United States*, 521 U.S. 898 (1997) ................................................ 28, 30

*Qualified Patients Ass'n v. City of Anaheim*,
    115 Cal. Rptr. 3d 89 (Cal. Ct. App. 2010) ...............................17, 24, 37

*Quern v. Jordan*, 440 U.S. 332 (1979)............................................................. 43

*Robbins v. Limestone County*, 268 S.W. 915 (Tex. 1925) ............................ 21

*Rush Univ. Med. Ctr. v. Leavitt*, 535 F.3d 735 (7th Cir. 2008)...................... 3

*Scheffer v. Railroad Co.*, 105 U.S. 249 (1881) .............................................. 23

*Seattle Audubon Society v. Sutherland,*
  2007 WL 1300964 (W.D. Wash. May 1, 2007)..................................................... 32

*Seminole Tribe v. Florida,* 517 U.S. 44 (1996)................................................. 42, 44

*Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir. 1991)........................................... 31

*In re Signal Int'l LLC*, 579 F.3d 478 (5th Cir. 2009) .......................................... 38

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ...................................... 4

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ................................... 3

*In re Stewart*, 647 F.3d 553 (5th Cir. 2011)..................................................... 4

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) .......................................... *passim*

*Strahan v. Linnon*, No. 97-1787, 1998 WL 1085817 (1st Cir. July 16, 1998) ................. 41

*Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637 (Tex. 2004).................. 21, 26

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001)......................... 15

*Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635 (2002)................................ 3, 43

*Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632 (2011)......................... 43

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................... 4

*Wilderness Soc'y v. Kane County*, 632 F.3d 1162 (10th Cir. 2011)........................... 18

*Wilderness Soc'y v. Kane County*, 581 F.3d 1198 (10th Cir. 2009)......................... 18, 37

*Willis v. Winters*, 253 P.3d 1058 (Or. 2011) ......................................... 17, 24, 37

*Ex parte Young*, 209 U.S. 123 (1908) .................................................. 3, 13, 43

## CONSTITUTION, STATUTES, AND RULES

U.S. CONST. art. III .............................................................. 3, 4, 32

U.S. CONST. amend. XI ..................................................... *passim*

16 U.S.C. § 1536(a)(2) ................................................................ 32

16 U.S.C. § 1538 ..................................................................... 28

16 U.S.C. § 1538(a)(1) ........................................................ 7, 14, 42

16 U.S.C. § 1538(g) ....................................................... *passim*

16 U.S.C. § 1539(a) .......................................................... 13, 42

16 U.S.C. § 1540(b)(1).............................................................. 19

16 U.S.C. § 1540(c) ........................................................................ 2

16 U.S.C. § 1540(g)(1)(A) ......................................................... 42, 45

28 U.S.C. § 1291 ........................................................................... 2

28 U.S.C. § 1331 ........................................................................... 2

TEX. WATER CODE § 11.121 ......................................... 10, 15, 28, 29

FED. R. CIV. P. 52(a)(1) ............................................................... 6

## OTHER AUTHORITIES

Jonathan H. Adler, *Judicial Federalism and the Future of Federal Environmental Regulation*, 90 IOWA L. REV. 377 (2005) .................................................. 36

Valerie Brader, *Shell Games: Vicarious Liability of State and Local Governments for Insufficiently Protective Regulations under the ESA*, 45 NAT. RESOURCES J. 103 (2005) .......................................... 36

JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE (3d ed. 2003) ...................... 2

James R. Rasband, *Priority, Probability, And Proximate Cause: Lessons From Tort Law About Imposing ESA Responsibility For Wildlife Harm On Water Users And Other Joint Habitat Modifiers,* 33 ENVT. L. 595 (2003) .................................... 36

J.B. Ruhl, *State and Local Government Vicarious Liability under the ESA*, 16 NAT. RESOURCES & ENV'T 70 (ABA Fall 2001) .............................. 36

13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE (3d ed. 2008) .................................................................................. 4

*Critter Crossings*, FED. HIGHWAY ADMIN., http://www.fhwa.dot.gov/environment/ critter_crossings/overview.cfm ......................................... 25

*Maine Installing Turtle Crossing Road Signs*, BANGOR DAILY NEWS (May 27, 2012), http://bangordailynews.com/2012/05/27/outdoors/maine-installing-turtle-crossing-road-signs/ .................................................. 25

No. 13-40317

# In the United States Court of Appeals for the Fifth Circuit

---

THE ARANSAS PROJECT,

*Plaintiff-Appellee,*

v.

BRYAN SHAW, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE TEXAS COMMISSION
ON ENVIRONMENTAL QUALITY; BUDDY GARCIA, IN HIS OFFICIAL CAPACITY AS
COMMISSIONER OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
CARLOS RUBINSTEIN, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; MARK VICKERY,
IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
AL SEGOVIA, IN HIS OFFICIAL CAPACITY AS
SOUTH TEXAS WATERMASTER,

*Defendants-Appellants,*

GUADALUPE-BLANCO RIVER AUTHORITY;
TEXAS CHEMICAL COUNCIL; SAN ANTONIO RIVER AUTHORITY,

*Intervenor Defendants-Appellants.*

---

On Appeal from the United States District Court for the
Southern District of Texas, Corpus Christi Division

---

## APPELLANTS' BRIEF FOR STATE DEFENDANTS

---

Appellants the Chairman, Commissioners, and Executive Director of the Texas

Commission on Environmental Quality, and the South Texas Watermaster

(collectively, "State Defendants") respectfully appeal the district court's final judgment

of March 12, 2013, and amended final judgment of March 18, 2013.

STATEMENT OF JURISDICTION

1.    The plaintiff invoked subject-matter jurisdiction in the district court under 16 U.S.C. § 1540(c) and 28 U.S.C. § 1331.  The district court entered a final judgment on March 12, 2013, and entered an amended final judgment on March 18, 2013.  USCA5.7859, 7937.  A timely notice of appeal was filed on March 19, 2013.  USCA5.7938–40.  This Court has jurisdiction of the appeal under 28 U.S.C. § 1291.

2.    The district court's memorandum opinion and order purports to award declaratory and injunctive relief to the plaintiff, but none of that is incorporated into the district court's judgment, which must be self-contained and cannot refer to any other document.  *See Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527 (7th Cir. 1988) ("[I]f the opinion contains language awarding declaratory relief, but the judgment does not, the opinion has been reduced to dictum; only the judgment need be obeyed."); *Local Union No. 1992, Int'l Bhd. of Elec. Workers v. Okonite Co.*, 358 F.3d 278, 284 (3d Cir. 2004) ("[A] judgment must, generally speaking, 'be a self-contained document, saying who has won and what relief has been awarded, but omitting the reasons for this disposition, which should appear in the court's opinion.'" (quoting JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 58.05[4][a] (3d ed. 2003) (internal quotation marks omitted))).

This oversight does not spoil appellate jurisdiction because an erroneous or defective judgment is still an *appealable* judgment, so long as it qualifies as a "final decision" under 28 U.S.C. § 1291.  *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 382–88

2

(1978) (per curiam). The district court's misstep will immunize the defendants from contempt proceedings. *See Bates v. Johnson*, 901 F.2d 1424, 1427–28 (7th Cir. 1990) ("When a judge does not record an injunction or declaratory judgment on a separate document, the defendant is under no judicial compulsion."). But it does not deprive this Court of jurisdiction to review the district court's decision. *See Rush Univ. Med. Ctr. v. Leavitt*, 535 F.3d 735, 738 (7th Cir. 2008); *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 977 (7th Cir. 1999).

**3.** In an effort to facilitate this Court's jurisdictional inquiry, we note two issues relevant to Article III standing. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The party invoking federal judicial power must demonstrate the familiar "triad of injury in fact, causation, and redressability." *Id.* at 103. It is not self-evident that the plaintiff has carried this burden. *See, e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

First, it is not clear that the plaintiff "suffered an injury in fact—an invasion of a legally protected interest which is . . . concrete and particularized, and . . . actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). The plaintiff can seek only prospective relief, in the form of an injunction or a declaratory judgment, in this suit against Texas officials. *See, e.g.*, *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645–46 (2002) (discussing *Ex parte Young*, 209 U.S. 123 (1908)). Yet the plaintiff's lawsuit takes a retrospective look at alleged whooping-crane deaths during a severe

drought in the winter of 2008-2009. It is well settled that "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief,'" and that a plaintiff seeking injunctive relief "must 'establish a real and immediate threat that he w[ill] again' suffer similar injury in the future." *In re Stewart*, 647 F.3d 553, 557 (5th Cir. 2011) (alterations in *Stewart*) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974), and *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). Contrary to the district court's understanding, the plaintiff cannot establish Article III standing with a mere showing that "if future water diversions are allowed, more [w]hooping [c]ranes *may well be* taken." USCA5.4065 (emphasis added).[1]

Second, the causation arguments advanced in the appellants' briefs could have jurisdictional implications, insofar as the plaintiff's putative causal chain may be too attenuated and too speculative to establish that its alleged injury is fairly traceable to the defendants named in the complaint. *See, e.g., Allen v. Wright*, 468 U.S. 737, 751, 756–61 (1984); *Warth v. Seldin*, 422 U.S. 490, 502–08 (1975); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40–46 (1976); *Linda R.S. v. Richard D.*, 410 U.S. 614, 616–19 (1973); *Friends of the Earth, Inc. v. Crown Cent. Petrol. Corp.*, 95 F.3d 358, 360–62 (5th Cir. 1996); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478–79 (D.C. Cir. 2009); 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE

---

[1] The district court did make a conclusory finding "that [the plaintiff] has established by a preponderance of the evidence that there is a reasonably certain threat of imminent harm to the [w]hooping [c]rane." USCA5.7846. We leave it to the plaintiff to defend this bald assertion.

§ 3531.5, at 318 (3d ed. 2008) ("[T]he acceptable chain of causation is cut by the courts at some point short of a clear showing that there could be no causal nexus.").

## STATEMENT OF THE ISSUES

1.  State officials do not violate the Endangered Species Act or the Supremacy Clause by declining to establish and enforce independent state-law prohibitions against conduct that violates federal law. When Texas officials issue state-law "permits" to draw water from the Guadalupe and San Antonio Rivers, those permits merely absolve the permit holder from state-law penalties for taking water; the permit holder remains bound to obey all federal legal obligations and remains subject to the federal penalties established for using water in violation of the Endangered Species Act. Did the district court err by holding that the issuance of a state-law permit can "violate" the Endangered Species Act?

2.  Did the district court err by holding that the issuance of a state-law permit to draw water from the Guadalupe and San Antonio Rivers proximately caused harm to whooping cranes residing in the Aransas National Wildlife Refuge?

3.  Did the district court exceed the scope of its lawful authority by ordering state officials to apply for an Incidental Take Permit?

4.  Did the district court violate the Supreme Court's Eleventh Amendment jurisprudence by entering declaratory and injunctive relief against a state agency, which had not even been named as a party to the litigation?

## STATEMENT OF THE CASE

On March 10, 2010, the Aransas Project sued five officials of the Texas Commission on Environmental Quality (TCEQ), alleging that these officials violated the Endangered Species Act by "authorizing" others to draw water from the Guadalupe and San Antonio Rivers. USCA5.43–47. The complaint alleged that these diversions from the Guadalupe and San Antonio Rivers reduced freshwater inflows into the San Antonio Bay, which abuts the Aransas National Wildlife Refuge. *Id.* at

33–39.  According to the complaint, the reduced freshwater inflows increased the salinity of the bay and the adjacent marshes, which in turn reduced the number of blue crabs, wolfberries, and drinkable water available for a flock of endangered whooping cranes that resides in the Aransas National Wildlife Refuge.  *Id.* at 28.  The complaint alleged that this reduction in blue crabs and wolfberries led to "food stress" among whooping cranes, and further alleged that this food stress caused a number of whooping cranes to die during the winter of 2008-2009.  *Id.* at 32.  Three entities intervened as defendants: the Guadalupe-Blanco River Authority (GBRA), the San Antonio River Authority (SARA), and the Texas Chemical Council (TCC).

The district court held an eight-day bench trial in December 2011.  On March 11, 2013, the district court issued a "Memorandum Opinion and Verdict of the Court,"[2] which adopted verbatim the findings of fact proposed by the plaintiff.  *Id.* at 7735–858 ("Memorandum Opinion").  The district court adopted the plaintiff's assertion that water diversions from the Guadalupe and San Antonio Rivers were reducing freshwater inflows into the San Antonio Bay, as well as the plaintiff's assertion that the ensuing increase in salinity reduces the number of blue crabs and wolfberries available for whooping cranes to eat.  *Id.* at 7843.  The district court adopted the plaintiff's assertion that the decline of blue crabs and wolfberries led to

---

[2] The district court erred by labeling this document a "Verdict of the Court."  Judges do not return "verdicts" when holding bench trials in civil cases.  They issue findings of fact and conclusions of law, *see* FED. R. CIV. P. 52(a)(1), and the findings of fact are reviewed under a standard less deferential than that accorded to "verdicts" returned by a jury.

"food stress" among whooping cranes in the Refuge. *Id.* at 7812. Finally, the district court determined that this food stress "caused the death of at least 23 cranes" during the winter of 2008-2009. *Id.* at 7812–22.

Based on these factual determinations, the district court concluded that the act of drawing water from the Guadalupe and San Antonio Rivers violates the Endangered Species Act by "tak[ing]" a protected species. *See* 16 U.S.C. § 1538(a)(1). But the plaintiff did not seek relief against the individuals or entities that draw water from the rivers. Instead, the plaintiff sued Texas officials, claiming that state officials violate the Endangered Species Act *by issuing permits* that allow others to draw water from the Guadalupe and San Antonio Rivers without fear of state-law penalties. The district court agreed with the plaintiff, holding that the issuance of these state-law permits violates the Endangered Species Act, either by "tak[ing]" an endangered species under 16 U.S.C. § 1538(a)(1), or by "caus[ing]" a "take" to be committed in violation of 16 U.S.C. § 1538(g). *See* USCA5.7853.

The district court then enjoined the TCEQ, its Chairman, and its Executive Director from "approving or granting new water permits affecting the Guadalupe or San Antonio Rivers until the State of Texas provides reasonable assurances to the Court that such permits will not take [w]hooping [c]ranes in violation of the ESA." *Id.* at 7856. The order further provides that "[w]ithin thirty (30) days of the date of entry of this Order, the TCEQ, its Chairman, and its Executive Director shall seek an Incidental Take Permit that will lead to development of a Habitat Conservation Plan."

7

*Id.* On March 12, 2013, the district court entered a final judgment, which declares that "[i]n accordance with the Court's Memorandum Opinion and Verdict of the Court, (D.E. 354), the Court enters judgment in favor [of] Plaintiff, The Aransas Project." *Id.* at 7859.

On March 15, 2013, the defendants moved for a stay pending appeal in the district court. The motion noted (among other things) that the district court's injunction would prohibit the TCEQ from granting emergency permits to address imminent threats to the public health and safety. *See id.* at 7908–09. Later that day, the district court denied the motion for stay but amended its injunction to provide that "TCEQ, its Chairman, and its Executive Director are enjoined from approving or granting new water permits affecting the Guadalupe or San Antonio Rivers, *with the exception of those permits necessary to protect the public's health and safety,* until the State of Texas provides reasonable assurances to the Court that such permits will not take [w]hooping [c]ranes in violation of the ESA." *See id.* at 7935–36 (emphasis added); *see also id.* at 7937.

The State Defendants filed a timely notice of appeal on March 19, 2013. USCA5.7938. On March 20, 2013, the State Defendants filed a motion for emergency stay pending appeal in this Court. GBRA filed a notice of appeal on March 22, 2013, USCA5.8002, and filed a separate motion for emergency stay pending appeal in this Court on March 22, 2013. On March 25, 2013, a motions panel of this Court granted

the motions for emergency stay and ordered expedited briefing. TCC and SARA then filed their notices of appeal on April 9 and 10, 2013.

Finally, on March 26, 2013, the plaintiff filed a motion in the district court seeking more than $3.3 million in attorneys' fees. USCA5 8202–11. The district court stayed its decision on that motion pending the outcome of this appeal. *Aransas Project v. Shaw*, No. 2:10-cv-75, Doc. No. 384.

## STATEMENT OF FACTS

Many factual issues in this case remain in dispute. The defendants continue to deny the plaintiff's and the district court's assertions that water diversions from the Guadalupe and San Antonio Rivers caused or contributed to the death of whooping cranes in the Aransas National Wildlife Refuge during the winter of 2008-2009. This much, however, is common ground between the parties.

A flock of endangered whooping cranes spends the winter months in the Aransas National Wildlife Refuge, and spends its summer breeding season in Canada. According to reports by the U.S. Fish and Wildlife Service, the population of this flock was estimated to be 247 at the end of the winter of 2008-2009, and was estimated to be 283 at the end of the winter of 2010-2011. When the whooping cranes reside in the Aransas National Wildlife Refuge, their diet includes wolfberries and blue crabs; when residing in Canada, they do not have wolfberries or blue crabs to eat.

The State of Texas was afflicted by a severe drought during the winter of 2008-2009.  During that winter, 4 whooping crane carcasses were recovered in the Aransas National Wildlife Refuge.  The National Wildlife Health Center (NWHC) performed necropsies on two of these carcasses.  USCA5.4248 (Archibald); *id.* at 5731, 5750 (Stroud); DX 118; DX 119; PX 24.  For the first carcass, the NWHC determined that the causes of death were:  (1) a laceration to the left hock joint knee resulting in (2) septic infectious arthritis; (3) acute and peracute necrosis (death) of the skeletal muscle of the legs; (4) possible terminal disseminated intravascular coagulation and hemolysis (breakdown of red blood cells); and (5) emaciation (loss of fat and muscle tissue).  DX 118 at NWHC00073; PX 24.  For the second carcass, the NWHC determined the causes of death as:  (1) predation; (2) severe emaciation (loss of fat and muscle tissue); and (3) an "IBDV-like" (infectious bursal disease) virus isolated from the bursa of the crane.  DX 119 at NWHC000074; PX 24.

Texas law forbids persons to take water from the State's rivers without first obtaining a permit from the TCEQ.  *See* TEX. WATER CODE § 11.121.  The TCEQ issues permits that allow the permit holder to draw water from the Guadalupe and San Antonio Rivers.  Each of those rivers flows into the San Antonio Bay, which abuts the Aransas National Wildlife Refuge.

Many factual questions remain in dispute.  The plaintiff asserts that water diversions from the Guadalupe and San Antonio Rivers are significantly increasing salinity levels in the San Antonio Bay; the defendants claim that even if no water had

been diverted from the Guadalupe and San Antonio Rivers during the winter of 2008-2009, the salinity levels would not have varied by more than about 1 part per thousand ("ppt") from the salinity levels actually recorded that year.  USCA5.5858–59 (Slack); *id.* at 6144–45 (Ward); DX 275; DX 424.  The plaintiff asserts that increased salinity levels in the bay reduced the amount of wolfberries and blue crabs available for whooping cranes to eat; the defendants deny this.  The plaintiff asserts that the alleged reduction in blue crabs or wolfberries contributed to whooping-crane mortality; the defendants claim that the whooping crane is an opportunistic omnivore that can adapt.  The plaintiff claims that the two whooping cranes on whom necropsies were performed died because of food shortage; the defendants claim that those whooping cranes died of other causes.  The plaintiff asserts that 19 additional whooping cranes died during the winter of 2008-2009; the defendants claim that there is insufficient evidence to support this.

The district court adopted the plaintiff's proposed findings of fact wholesale and resolved all disputed questions of fact in the plaintiff's favor.  USCA5.7843.

## SUMMARY OF THE ARGUMENT

State officials do not "violate" the Endangered Species Act by issuing state-law permits, even if the permitted activity "take[s]" an endangered whooping crane in violation of federal law.  A state-law permit—whether for driving, hunting, or taking water from the State's rivers—merely immunizes the permit holder from *state-law penalties* for that conduct.  A State has every prerogative to refrain from imposing

independent state-law prohibitions on conduct that violates federal law, and TCEQ officials do not "violate" the Endangered Species Act (or any other provision of federal law) by exempting permit holders from the state-law prohibition on taking water from the State's rivers. The district court's interpretation of the Endangered Species Act violates the Supreme Court's anti-commandeering doctrine because it compels TCEQ officials to maintain state-law prohibitions on conduct that allegedly violates federal law.

The State Defendants are entitled to judgment for an additional, independent reason: There is no proximate causation between the issuance of a state-law permit and the alleged harm to whooping cranes in the Aransas National Wildlife Refuge. The plaintiff alleges a complex chain of events that is supposedly set in motion by the decision to issue a TCEQ permit: The state official issues the permit; the permit holder chooses to draw water from the rivers; the water diversions contribute to increased salinity in the downstream water; the increased salinity contributes to a reduction in the blue-crab population and the wolfberry yield; the reduction in blue crabs and wolfberries contributes to "food stress" in the whooping cranes; and the "food stress" contributes to the death of whooping cranes during the winter of 2008-2009. What's more, many intervening factors are in play. The salinity of the water was affected by the severe drought that occurred during the winter of 2008-2009; the blue-crab population is affected by temperature, tides, and commercial crab trapping; and whooping-crane mortality is affected by predators, disease, old age, and countless

other factors.  The district court's factual determinations establish at most but-for causation between the issuance of a TCEQ permit and the supposed harm that occurred.  The causal chain in this case is far too attenuated to qualify as proximate cause.

Finally, the district court violated the Supreme Court's Eleventh Amendment jurisprudence in multiple ways.  The district court ordered state officials to apply for an Incidental Take Permit under 16 U.S.C. § 1539(a), but the district court had no authority to order this relief because state officials do not violate federal law by declining to seek an Incidental Take Permit, and the *Ex parte Young* exception to state sovereign immunity applies only when a court enjoins an ongoing violation of federal law.  The district court also violated the Supreme Court's Eleventh Amendment jurisprudence by entering declaratory and injunctive relief against the TCEQ, a state agency that not only is immune from suit but was not even named as a party to this litigation.

For these reasons, along with the reasons presented by the intervenors, the State Defendants are entitled to judgment as a matter of law.

## ARGUMENT

## I. STATE OFFICIALS DO NOT VIOLATE THE ENDANGERED SPECIES ACT BY ISSUING STATE-LAW PERMITS

The district court found that TCEQ officials "take" an endangered species by permitting third parties to draw water from the Guadalupe or San Antonio Rivers.

USCA5.7843–46.   That is demonstrably wrong—even if one accepts the district court's mistaken determination that water diversion from those rivers is the proximate cause of harm to whooping cranes.   The State Defendants vigorously deny the plaintiff's assertions that TCEQ permit holders are harming endangered whooping cranes by drawing water from the Guadalupe or San Antonio Rivers.   *See* Section II, *infra*.   But this section will show that the State Defendants are entitled to judgment even if one assumes, solely for the sake of argument, that the act of drawing water from the San Antonio and Guadalupe Rivers constitutes a "take" of endangered whooping cranes under the Endangered Species Act.

The State Defendants are entitled to judgment because the Endangered Species Act does not impose vicarious liability on state officials for "take[s]" committed by a State's residents, and it does not prohibit state officials from licensing activities that result in harm to endangered species.   The plaintiff's argument, if accepted by this Court, would prohibit state officials from issuing driver's licenses because it is not only foreseeable but inevitable that endangered species will be killed or injured by motor-vehicle traffic.   It also violates the Supreme Court's anti-commandeering doctrine, because a State cannot be compelled to maintain state-law prohibitions on conduct that violates federal law.

The argument in this section proceeds in four parts.   Part A explains why issuing a state-law permit does not "take" an endangered species within the meaning of 16 U.S.C. § 1538(a)(1).   Part B explains why issuing a state-law permit does not

"cause" a take of an endangered species under 16 U.S.C. § 1538(g). Part C explains why the canon of constitutional avoidance compels this Court to reject the district court's construction of the Endangered Species Act. Finally, Part D explains why the First Circuit's opinion in *Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997), is not persuasive and cannot be followed by this Court.

### A. The Act Of Issuing A State-Law Permit To Draw Water From The San Antonio And Guadalupe Rivers Does Not "Take" An Endangered Species

The issuance of a state-law permit does not "take" an endangered species, nor does it "authorize" the permit holder to take an endangered species in violation of federal law. A TCEQ permit immunizes the permit holder from *state-law penalties* in the event that he chooses to draw water from the Guadalupe or San Antonio Rivers. *See* Tex. Water Code § 11.121. The permit holder remains bound to obey all federal legal requirements, including the Endangered Species Act. *See* 16 U.S.C. § 1540; *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) (exemption from state-law prohibitions on marijuana use has no bearing on the duty to obey federal drug laws). A state-law permit will never "authorize" the permit holder to act in a manner that violates federal law, as the district court claimed throughout its opinion. *See* USCA5.7747, 7779, 7856. The effect of issuing a TCEQ permit is no different from issuing a hunting license: The licensed hunter, like the TCEQ permit holder, remains under a duty to obey federal laws that prohibit "take[s]" of endangered species.

If a TCEQ permit holder decides to take water from the rivers in a manner that violates the Endangered Species Act, he will face the remedies provided by federal law even though state law does not prohibit his actions. *See* 16 U.S.C. § 1540. The state permitting authorities, however, have done nothing illegal. State officials are not required to establish or maintain independent state-law prohibitions and penalties on persons who violate the Endangered Species Act (or any other federal law). And there is no requirement in the Endangered Species Act that state officials supplement the federal remedies in 16 U.S.C. § 1540 by withholding state-law permits from persons who seek to use the State's rivers in a manner that violates the Endangered Species Act.

The district court's opinion misunderstands the federalist structure of our government and the principles of dual sovereignty on which it rests. An example is the district court's declaration that Texas water regulations "are preempted by federal law when they purport to authorize water diversions that result in a taking of the whooping cranes." USCA5.7856. A state-law permit does not "purport to authorize" violations of federal law and cannot be "preempted" by federal law; it simply provides an immunity from state-law punishment if the permit holder acts in accordance with the terms of the permit. That is the reality of a federalist system of government; there is no conflict, contradiction, or preemption when one sovereign declines to prohibit or punish acts that the other sovereign has outlawed.

Indeed, a State may always choose to legalize or license activities that violate federal law, and may always refrain from imposing state-law consequences on behavior that federal law prohibits. Colorado did not violate the Supremacy Clause when it repealed its state-law penalties for marijuana use. And state officials do not violate federal drug statutes by licensing the use of marijuana for medical purposes, because these licenses are issued purely as a matter of state law and leave in place the federal prohibitions and penalties established in the Controlled Substances Act. *See Qualified Patients Ass'n v. City of Anaheim*, 115 Cal. Rptr. 3d 89, 107 (Cal. Ct. App. 2010) ("California's decision . . . to decriminalize *for purposes of state law* certain conduct related to medical marijuana does nothing to 'override' or attempt to override federal law, which remains in force. To the contrary, because the [state laws] do not mandate conduct that federal law prohibits, nor pose an obstacle to federal enforcement of federal law, the enactments' decriminalization provisions are not preempted by federal law." (citations omitted)). For the same reason, state officials may issue concealed-handgun licenses to persons who are prohibited by federal law from possessing firearms. *See Willis v. Winters*, 253 P.3d 1058, 1066 (Or. 2011) (ordering sheriff to issue state concealed-handgun licenses to medical-marijuana users, even though federal law prohibits all marijuana users from possessing firearms, because the license merely "exempt[s] him or her from prosecution or arrest under [state law], but it does not in any way preclude full enforcement of the federal law by federal law enforcement officials").

17

Just as state officials may issue permits and licenses for activities that violate the federal Controlled Substances Act and federal gun-control laws, so too may TCEQ officials issue permits for water usage that violates the Endangered Species Act. It makes no difference whether a State decides to license these activities at the wholesale level (by repealing state-law prohibitions) or at the retail level (by issuing state-law permits to individuals). Either way, the State is acting within its rights by exempting federal lawbreakers from state-law penalties. If a TCEQ permit holder acts in a manner that violates the Endangered Species Act, then that is a matter for the federal authorities to resolve. State officials who license activities that violate federal law do not violate any federal legal obligation and do not become vicariously liable for the license holder's unlawful acts. *See Wilderness Soc'y v. Kane County*, 581 F.3d 1198, 1237–38 (10th Cir. 2009) (McConnell, J., dissenting) ("In our federal system of government, the various layers of government—federal, state, and local—have independent authority to determine whether and how to regulate matters that fall within their enumerated or reserved powers. States and localities do not have to pass ordinances forbidding all conduct that is forbidden under federal law. . . . Federal and state laws conflict only if the parties they regulate cannot simultaneously comply with both sets of law.").[3]

---

[3] The panel opinion in *Wilderness Society*, which rejected Judge McConnell's arguments, was repudiated on other grounds by the en banc Tenth Circuit. *See Wilderness Soc'y v. Kane County*, 632 F.3d 1162 (10th Cir. 2011) (en banc).

This is not to say that a State's officials can never be deemed to "take" an endangered species by authorizing or blessing actions carried out by private parties. If a state agency hired a tree surgeon to cut down trees that serve as habitat for an endangered species, the State's officials would be legally responsible for their employee's actions under the law of agency, and would be as guilty of "tak[ing]" the species as the person wielding the chainsaw. *See, e.g.*, *Poly-America, Inc. v. NLRB*, 260 F.3d 465, 480 (5th Cir. 2001). And if a state official enters into a criminal conspiracy with a landowner to knowingly violate the Endangered Species Act, or aids and abets that criminal act, he would be deemed to have "take[n]" any of the endangered species harmed by the landowner's actions under the rules of conspiratorial and accomplice liability. *See* 16 U.S.C. § 1540(b)(1); *see also Pinkerton v. United States*, 328 U.S. 640 (1946). But absent the vicarious liability created by an agency relationship or a joint criminal venture, a "take" committed by a private party cannot be imputed to a state official who merely allowed the act to proceed without fear of state-law punishment. A state official will also violate the Endangered Species Act if he asks others to "take" an endangered species; in these situations, the state official will have violated the Endangered Species Act's independent prohibition on "solicit[ing]" others to violate the Endangered Species Act.

The plaintiff wonders whether the Endangered Species Act would allow Texas officials to "issue a hunting license to kill an endangered whooping crane." *See* Response to Motion for Emergency Stay at 12–13. The answer is yes (with one

important caveat discussed below). The hunter would remain subject to federal prosecution if he kills a whooping crane, but the state officials would not violate the Endangered Species Act by exempting this act from state-law penalty. The license would not be "preempted," as the plaintiff claims, because a state-law license does not purport to alter the licensee's federal legal obligations, nor does it purport to absolve him of the penalties imposed by federal law. There is no "conflict" (and no preemption) when state officials legalize or license an activity that violates federal law; this remains true whether the relevant activity involves medical marijuana, the possession of firearms, or "take[s]" of endangered species.

There is, however, an important caveat. State officials will violate the Endangered Species Act if they cross the line that separates the mere *licensing* of an activity from the *solicitation* of a "take." If, for example, a State's license required or asked the licensee to kill endangered whooping cranes, then the State would be engaged in unlawful solicitation under 16 U.S.C. § 1538(g). But the plaintiff does not even contend that TCEQ officials have "solicit[ed]" the permit holders to draw water from the rivers by issuing these permits, USCA5.20–53, and the TCEQ permits do not come close to approaching the line that separates licensing from solicitation.

The plaintiff suggests that the State's ownership of the water in the rivers somehow makes the State Defendants responsible for any "take" allegedly committed

by TCEQ permit holders. *See* Response to Motion for Emergency Stay at 9.[4] On this view, Texas officials would be prohibited from issuing driver's licenses, because the State owns public roads in the State and licensed drivers "take" endangered species by running over them. *See Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 645 (Tex. 2004) ("Public roads are state property over which the state has full control and authority." (citing *Robbins v. Limestone County*, 268 S.W. 915, 918 (Tex. 1925))). But in all events, the plaintiff has insisted throughout this litigation that state officials are responsible for "take[s]" committed by their licensees regardless of whether the "take" involves State-owned property. *See* Response to Motion for Emergency Stay at 10–12; *id.* at 10 ("ESA prohibitions apply to actions by state agencies where their regulatory programs authorize actions by third parties that contribute to causing the take."). The plaintiff also endorses *Strahan*, 127 F.3d 155, which held that Massachusetts officials violated the Endangered Species Act by licensing gillnet and lobster pot fishing in the Atlantic Ocean (which is not owned by the State). If the plaintiff now wants to argue that state officials become liable for "take[s]" committed by state permit holders only when the "take" involves State-owned property, then it

---

[4] The plaintiff cites Texas Water Code § 11.021, which declares surface water as the property of the State, but the State's ownership of the water is not absolute. It is subject to the vested state-law property rights of landowners, which limit the scope of the State's authority over the water. *See Clark v. Briscoe Irr. Co.*, 200 S.W.2d 674, 679 (Tex. Civ. App.—Austin 1947, no writ) (any usufruct in surface water is vested for purposes of the constitution once it is perfected); *Creedmoor-Maha Water Supply Corp. v. TCEQ*, 307 S.W.3d 505, 515 n.6 (Tex. App.—Austin 2010, no pet.) (existence of a vested property right is an independent basis for judicial review of government action regarding that right).

must acknowledge that *Strahan* was wrongly decided and repudiate its reliance on that decision.

TCEQ officials cannot be deemed to "take" endangered whooping cranes by issuing state-law permits, even if one accepts the plaintiff's mistaken assertions that the permit holders are violating the Endangered Species Act by drawing water from the Guadalupe or San Antonio Rivers. And TCEQ officials are not vicariously liable for "take[s]" allegedly committed by TCEQ permit holders.

### B. The Act Of Issuing A State-Law Permit To Draw Water From The San Antonio And Guadalupe Rivers Does Not "Cause" A "Take" Of An Endangered Species

The district court's opinion also suggests that TCEQ officials have "cause[d]" their permit holders to "take" an endangered species by legalizing or licensing activities that result in harm to whooping cranes. USCA5.7853; *see also* 16 U.S.C. § 1538(g) ("It is unlawful for any person subject to the jurisdiction of the United States to . . . cause to be committed . . . any offense defined in this section."). The plaintiff asserts this more explicitly, claiming that "TCEQ Officials have 'caused a take to be committed'" by allowing permit holders to draw water from the Guadalupe and San Antonio Rivers. *See* Response to Motion for Emergency Stay at 12.

Both the plaintiff and the district court are mistaken. A state official does not "cause" a take of an endangered species by legalizing or licensing an activity under state law, and then allowing others to choose whether to engage in conduct that purportedly results in harm to the species. Rather, a state official will "cause" a take

22

committed by a third party only if it compels the third-party conduct that "take[s]" an endangered species.  An intervening actor with free will breaks the chain of causation. *See Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 837–38 (1996); *Scheffer v. Railroad Co.*, 105 U.S. 249 (1881).  The act of issuing a TCEQ permit does not "cause" a permit holder to take an endangered species in violation of 16 U.S.C. § 1538(g), because the permit holder retains his autonomy and is not compelled by state officials to draw water from the rivers.

The plaintiff and the district court contend that TCEQ officials have "cause[d]" permit holders to "take" endangered whooping cranes by failing to maintain state-law prohibitions against the usage of water in the Guadalupe and San Antonio Rivers.  USCA5.7843–46.  From this standpoint, the federal sanctions and remedies provided in 16 U.S.C. § 1540 are inadequate to deter the permit holders from committing "take[s]" because the Secretary of the Interior has declined to bring enforcement actions against the persons and entities using water in the Guadalupe and San Antonio Rivers.  Therefore, because the state officials *could have* used their regulatory powers to stop these water diversions from the Guadalupe and San Antonio Rivers, and have chosen not to do so, they have "caused" the alleged "take[s]" to occur within the meaning of 16 U.S.C. § 1538(g).

The plaintiff's and the district court's construction of the word "cause" imposes a duty to rescue on every state official who has the authority to prevent a

"take" from occurring.  That is not a tenable construction of 16 U.S.C. § 1538(g).[5]  In

no area of law does a state official become legally responsible for conduct undertaken

by autonomous private actors, merely because the State has chosen to legalize or

license that activity.  *See generally The Civil Rights Cases*, 109 U.S. 3 (1883); *Am. Mfrs.*

*Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999); *Qualified Patients*, 115 Cal. Rptr. 3d 89;

*Willis*, 253 P.3d 1058.  Colorado officials do not "cause" the residents of their State to

smoke marijuana in violation of federal law, now that Colorado has repealed its state-

law penalties for marijuana use.  Any Coloradan who chooses to smoke marijuana

does so of his own free will—just like the TCEQ permit holders who choose to draw

water from the Guadalupe or San Antonio Rivers.  The plaintiff tries in vain to

distinguish the Colorado situation by suggesting that the grant of a TCEQ permit "is

not a 'refusal' by the State to act."  Response to Motion for Emergency Stay at 17.

But the term "take" includes omissions as well as acts, *see* 50 C.F.R. § 17.3, and in all

events the repeal of an existing statute is an affirmative act, not a refusal to act.[6]

Colorado's repeal of its marijuana laws conferred a state-law permit to use marijuana

---

[5] It is also an unconstitutional construction, for the reasons discussed in Section I.C, *infra*.

[6] The plaintiff also does not believe that a state official's "refusal to act" is immune from liability under the Endangered Species Act.  In the district court, the plaintiff repeatedly argued that TCEQ officials violated the Endangered Species Act by refusing to revoke or modify previously issued permits, and explicitly asserted that the state officials' omissions and refusals to act violated the Endangered Species Act.  *E.g.*, USCA5.41, 7060–61.  If the plaintiff is now disowning these arguments that it advanced in the district court, it should say so.  If it is not abandoning that position, then it cannot distinguish Colorado's repeal of its marijuana laws by calling it a "refusal by the State to act."

on every one of its residents.    Wholesale legalization is indistinguishable from individual licensing.

Even if the plaintiff's interpretation of the word "cause" could somehow be limited to state officials' licensing decisions, and exclude a State's decision to legalize activity across the board, it would still represent a preposterous construction of 16 U.S.C. § 1538(g).    The plaintiff, for example, insists that state officials violate the Endangered Species Act when "their regulatory programs authorize actions by third parties that contribute to the take."    *See* Response to Motion for Emergency Stay at 10.    This construction of the Endangered Species Act will prohibit Texas officials from issuing driver's licenses because endangered ocelots and turtles have been frequent victims of roadkill,[7] and it is not only foreseeable but inevitable that the decision to authorize driving will "contribute to the take" of those species.[8]

The plaintiff asserts that "[a] Texas-issued water permit is nothing like a driver's license" because "TCEQ Officials specify the manner in which the water can be used—location, time, and amount—and command that there be 'ongoing

---

[7] *See Maine Installing Turtle Crossing Road Signs*, BANGOR DAILY NEWS (May 27, 2012), http://bangordailynews.com/2012/05/27/outdoors/maine-installing-turtle-crossing-road-signs/ (reporting that towns in Maine installed signs to "warn motorists of endangered turtle road crossing locations in Wells, South Berwick and York with the hope of reducing road deaths of two of the state's rarest species"); *Critter Crossings*, FED. HIGHWAY ADMIN., http://www.fhwa.dot.gov/environment/critter_crossings/overview.cfm (last visited May 2, 2013) ("[R]oadkill has helped reduce the population of a federally endangered cat—the ocelot—to about 80 animals.").

[8] The plaintiff notes that *Strahan* "rejected comparisons of fishing permits to a driver's license." *See* Response to Motion for Emergency Stay at 12. *Strahan*'s discussion of driver's licenses has no application in States where endangered species are inadvertently run over by motor vehicles, and is not responsive to the argument that the State is presenting here. *See* Section I.D, *infra*.

supervision.'" *See* Response to Motion for Emergency Stay at 12.  But the plaintiff never explains why these features of a TCEQ permit have any legal relevance. Driver's licenses will also specify conditions (such as the type of motor vehicle that may be operated and a requirement to wear corrective lenses), but the level of detail in a driver's license (or in a TCEQ permit) has nothing to do with whether the issuance of that license "take[s]" or "causes" a take of the ocelots, turtles, and other endangered species that will inevitably suffer harm from motor-vehicle traffic.  The plaintiff correctly notes that "proximate causation acts a backstop," but it does not (and cannot) argue that the causal link between driving and harming roadkill is less direct than the far more attenuated connection between water usage and harm to whooping cranes alleged in this case.  *See* Response to Motion for Emergency Stay at 12 n.12.

Finally, the plaintiff relies on the fact that the State owns the water in the Guadalupe and San Antonio Rivers, but the State also owns the public roads in the State.  *See City of Sunset Valley*, 146 S.W.3d at 645.  If the State's ownership of the water makes it liable for "caus[ing]" the "take[s]" committed by TCEQ permit holders, then the State's ownership of the roads makes it equally liable for "caus[ing]" the "take[s]" committed by State-licensed drivers.  The plaintiff's earlier briefing in this Court never conceded that the Endangered Species Act would allow Texas officials to issue driver's licenses when it is foreseeable that ocelots and turtles will be harmed by motor-vehicle traffic, doubtless because it recognizes that this concession

would be incompatible with its claim that state officials violate the Endangered Species Act whenever "their regulatory programs authorize actions by third parties that contribute to the take" of an endangered species.

### C.    The Canon Of Constitutional Avoidance Requires This Court To Reject The Plaintiff's Construction Of The Endangered Species Act

The plaintiff and the State Defendants offer competing interpretations of the words "take" and "cause" in the Endangered Species Act.    The canon of constitutional avoidance requires this Court to accept the State Defendants' construction of the Act because the plaintiff's interpretation violates the Supreme Court's anti-commandeering jurisprudence.    At the very least, the plaintiff's interpretation of the Act will require this Court to resolve a serious constitutional question that the State's construction of the Act will avoid.  *See Parker v. County of Los Angeles*, 338 U.S. 327, 333 (1949) ("The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity.");  *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam) ("[N]ormally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").

The problem with the plaintiff's construction of the Endangered Species Act is that it requires the State of Texas to impose and maintain *state-law* prohibitions and penalties against persons who violate a *federal* legal obligation, and no statute may be construed to impose such a requirement without running afoul of the anti-

27

commandeering rule of *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997). The federal government cannot require the Texas legislature to enact a law prohibiting individuals from drawing water from the Guadalupe or San Antonio Rivers, nor can it forbid the Texas legislature to repeal the law prohibiting unlicensed use of the state's waters. *See New York*, 505 U.S. at 166 ("[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts."). It logically follows that a federal statute cannot prevent TCEQ officials from establishing individualized exemptions from the state-law prohibitions of TEX. WATER CODE § 11.121. Whether to establish a state-law prohibition on water use, and how extensively it should be defined and enforced, is a matter the Constitution leaves entirely with state officials. It cannot be countermanded by any federal statute, agency, or court decision.

The State is not by any means suggesting that the anti-commandeering doctrine exempts state officials from complying with the Endangered Species Act's prohibitions on "take[s]." If water diversions from the Guadalupe and San Antonio Rivers are indeed causing "take[s]" of whooping cranes in violation of 16 U.S.C. § 1538, then TCEQ officials are forbidden to draw water from the rivers themselves, hire others to draw water from the rivers, ask others to take water from the rivers, or "cause" others to take water from the rivers by requiring or directing them to do so. The anti-commandeering doctrine establishes a narrow but constitutionally imperative

restriction on Endangered Species Act liability:  A state official cannot be deemed to violate the Endangered Species Act by failing to impose state-law prohibitions on conduct that "take[s]" an endangered species, by failing to enforce state-law prohibitions on conduct that "take[s]" an endangered species, or by establishing case-by-case exemptions from those state-law prohibitions in the form of a TCEQ license.  By depriving TCEQ officials of the prerogative to issue permits under state law, the district court unlawfully commandeered the State's executive by requiring it to maintain the state-law prohibitions on water use established in Tex. Water Code § 11.121.

Judge Kozinski's concurrence in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), explains why federal statutes cannot be construed to require States to maintain state-law prohibitions on conduct.  In voting to enjoin a federal policy that prohibited physicians from recommending medical uses of marijuana to their patients, Judge Kozinski wrote:

> [M]uch as the federal government may prefer that California keep medical marijuana illegal, it cannot force the state to do so.  Yet, the effect of the federal government's policy is precisely that:  By precluding doctors, on pain of losing their DEA registration, from making a recommendation that would legalize the patients' conduct under state law, the federal policy makes it impossible for the state to exempt the use of medical marijuana from the operation of its drug laws.  In effect, the federal government is forcing the state to keep medical marijuana illegal.  But preventing the state from repealing an existing law is no different from forcing it to pass a new one; in either case, the state is being forced to regulate conduct that it prefers to leave unregulated.

It is true that by removing state penalties for the use of marijuana, a doctor's recommendation may embolden patients to buy the drug, and others to sell it to them, in violation of federal law. But the doctors *only* help patients obtain the drug by removing state penalties for possession and sale; they do not purport to exempt patients or anyone else from federal law, nor could they. If the federal government could make it illegal under federal law to remove a state-law penalty, it could then accomplish exactly what the commandeering doctrine prohibits: The federal government could force the state to criminalize behavior it has chosen to make legal. That patients may be more likely to violate federal law if the additional deterrent of state liability is removed may worry the federal government, but the proper response—according to *New York* and *Printz*—is to ratchet up the federal regulatory regime, *not* to commandeer that of the state.

*Conant*, 309 F.3d at 645–46 (Kozinski, J., concurring) (footnotes omitted).

Perhaps the plaintiff will disagree with the State's anti-commandeering argument, or with Judge Kozinski's concurrence in *Conant*. But the State is not required to prove that the plaintiff's construction of the Endangered Species Act will in fact violate the Constitution. It is enough to show that the plaintiff's interpretation of the Act will raise substantial constitutional questions that will be avoided by adopting the State's interpretation. *See, e.g., INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001); *Gregory v. Ashcroft*, 501 U.S. 452 (1991); *NLRB v. Catholic Bishop*, 440 U.S. 490, 500 (1979). The plaintiff cannot possibly maintain that the State's anti-commandeering argument (or Judge Kozinski's concurrence in *Conant*) is so far off base that it does not even give rise to a substantial constitutional question. The canon of constitutional avoidance therefore requires this Court to reject the plaintiff's construction of the Endangered Species Act and adopt the State's construction.

### D.    The First Circuit's Decision In *Strahan* Is Not Persuasive And Should Be Expressly Repudiated By This Court

No judicial decision that represents law in this Court has ever held that state officials violate the Endangered Species Act by licensing or permitting third parties who "take" an endangered species.  Instead, the plaintiff touts opinions from courts outside the Fifth Circuit, which (it claims) support the notion that "ESA prohibitions apply to actions by state agencies where their regulatory programs authorize actions by third parties that contribute to causing the take."  Response to Motion for Emergency Stay at 10 (citing cases).

Many of the cases cited in the plaintiff's earlier briefing are not remotely on point.  The opinion in *Animal Welfare Institute v. Martin*, 623 F.3d 19 (1st Cir. 2010), expressly declined to rule on the arguments that the State Defendants are presenting here.  *See id.* at 26 n.8 ("We need not reach Maine's argument that it has not violated the ESA by licensing trappers who take lynx, nor Maine's argument that the injunctive relief requested by plaintiffs would violate the Tenth Amendment.").  Other decisions hold that *federal* officers and agencies violate the Endangered Species Act by approving third-party activities that "take" endangered species.  *See, e.g., Defenders of Wildlife v. EPA*, 882 F.2d 1294 (8th Cir. 1989); *Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir. 1991).  But the State Defendants are not contesting the obligations of federal officials to use their regulatory authority to prevent "take[s]" of endangered species. The premise of the State Defendants' argument is that state and federal governments

are distinct sovereigns, and that state officials may therefore decline to impose state-law prohibitions and penalties on persons who violate the Endangered Species Act or any other provision of federal law. What's more, the Endangered Species Act imposes special responsibilities on federal agencies that exceed the obligations established for state officials, and specifically limits the ability of federal agencies to "authorize[]" activities that might result in harm to endangered species. *See* 16 U.S.C. § 1536(a)(2) (requiring federal agencies to consult with Fish & Wildlife Services to ensure that endangered species will not be harmed by "any action *authorized*, funded, or carried out by such agency" (emphasis added)).

*Strahan* is the only decision from a federal court of appeals holding that state officials violate the Endangered Species Act by licensing or permitting activities that result in a "take" of endangered species.[9] *Strahan* held that Massachusetts officials violated section 9 of the Endangered Species Act by issuing licenses for gillnet and

---

[9] The ruling in *Loggerhead Turtle v. County Council of Volusia County*, 148 F.3d 1231 (11th Cir. 1998), addressed only whether the plaintiff had Article III standing to sue state officials, and expressly disclaimed any ruling on whether state officials could be held liable on the merits for their failure to restrict beachfront lighting. *See id.* at 1250 ("Because the district court dismissed the Turtles' claims of takes . . . for lack of *standing,* we need not decide whether the Turtles have made a sufficient showing of causation for purposes of *liability.*"). On remand, the district court held that the county officials' failure to restrict beachfront lighting did *not* cause harm to the endangered turtles, and therefore did not violate the Endangered Species Act. *See Loggerhead Turtle v. County Council of Volusia County*, 92 F. Supp. 2d 1296 (M.D. Fla. 2000).

As for the district-court opinions on which the plaintiff relies: *Animal Welfare Institute v. Martin*, 588 F. Supp. 2d 70 (D. Me. 2008), simply followed the First Circuit's ruling in *Strahan*, as it was obligated to do under the norms of stare decisis. *See id.* at 99 ("This question is settled in the First Circuit."). The unpublished district-court opinion in *Seattle Audubon Society v. Sutherland*, 2007 WL 1300964 (W.D. Wash. May 1, 2007), likewise relies on the flawed reasoning in *Strahan*, and does not acknowledge or answer the arguments that the State Defendants are presenting in this case. In all events, opinions from district judges have no precedential value even upon the same district judge who decided the case. *See, e.g., Camreta v. Greene*, 131 S. Ct. 2020, 2033 n.7 (2011).

lobster pot fishing, because endangered Northern right whales would occasionally become entangled in this commercial fishing gear.   127 F.3d at 158–59, 163–64. Although private fishermen rather than state officials put the fishing equipment into the water, the *Strahan* Court insisted that "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA."  *Id.* at 163.

Opinions from other courts of appeals are not binding and are followed only to the extent that they offer persuasive reasons for their conclusions.  *See Milofsky v. Am. Airlines, Inc.*, 404 F.3d 338, 345–46 (5th Cir. 2005).   The opinion in *Strahan* is not persuasive and should be expressly repudiated by this Court.   First, *Strahan* never explains how state officials can "take" an endangered species or "cause" a take of that species by refusing to establish state-law prohibitions or penalties on fishing practices that are already prohibited by federal law.   Like the district court in this case, the *Strahan* opinion proceeds as if the States are regional offices of the federal government, rather than distinct sovereigns whose legal duties and obligations are independent from those imposed by the federal government.

Second, the opinion in *Strahan*, if adopted by this Court, will prohibit Texas officials from issuing driver's licenses because the ocelot has been a frequent victim of roadkill.[10]   If state officials violate the Endangered Species Act by licensing commercial fishing practices that result in harm to endangered whales, they will also

---

[10] *See* footnote 7, *supra.*

violate the Endangered Species Act by licensing driving practices that result in harm to endangered cats. *Strahan* tried to distinguish driving from the use of gillnets and lobster pots by arguing that the latter activity cannot be performed "without risk of violating the ESA by exacting a taking." 127 F.3d at 164. The Court explained:

> [W]hereas it is possible for a person licensed by Massachusetts to use a car in a manner that does not risk the violations of federal law suggested by the defendants, it is not possible for a licensed commercial fishing operation to use its gillnets or lobster pots in the manner permitted by the Commonwealth without risk of violating the ESA by exacting a taking. . . . Where the state has licensed an automobile driver to use that automobile and her license in a manner consistent with both state and federal law, the violation of federal law is caused only by the actor's conscious and independent decision to disregard or go beyond the licensed purposes of her automobile use and instead to violate federal, and possibly state, law. The situation is simply not the same here. In this instance, the state has licensed commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to result in a violation of federal law.

*Id.* This distinction does not work in States populated by endangered species that suffer harm from motor-vehicle traffic. It is *not* possible for licensed drivers in Texas to operate a motor vehicle in a manner that does not "risk" a take of the ocelot, and it is inevitable (not merely "likely") that the State's decision to license and permit driving will cause the deaths of members of endangered species. The licensing of drivers in Texas is indistinguishable from licensing the use of gillnets and lobster pots in the Massachusetts coastal waters.

Third, *Strahan* fails to adequately refute the anti-commandeering argument presented by the Massachusetts officials, who had argued that imposing liability on

state officials for licensing or permitting an activity prohibited by federal law would effectively compel a State to maintain state-law prohibitions on private activities. The court responded that the State's constitutional objection "need only detain us momentarily," and then brushed it aside with three perfunctory sentences:

> The point that the defendants miss is that the district court's ruling does not impose positive obligations on the Commonwealth by converting its regulation of commercial fishing operations into a tool of the federal ESA regulatory scheme. The Commonwealth is not being compelled to enforce the provisions of the ESA. Instead, the district court's ruling seeks to end the Commonwealth's continuing violation of the Act.

*Id.* at 164. The court never explained how a federal statute could prevent state officials from licensing the use of gillnets and lobster pots without "compell[ing]" the State to "enforce the provisions of the ESA," and without converting the State's regulatory apparatus "into a tool of the federal regulatory scheme." When state officials are *forbidden to license* an activity, it logically follows that they are *compelled to prohibit* that activity under state law, and that means they are compelled to use their state-law powers to enforce a federal regulatory scheme. It is no answer to say that the Court's ruling merely "seeks to end the Commonwealth's continuing violation of the Act." The very question to be resolved is whether the Endangered Species Act should be interpreted to prohibit state officials from licensing private activities that allegedly harm endangered species, and whether the Constitution allows the Endangered Species Act to be interpreted in this manner. Worse, *Strahan* did not acknowledge the canon of constitutional avoidance, which requires courts to construe

federal statutes to avoid serious constitutional questions, even if the court would ultimately reject the constitutional objections if it were forced to reach the issue.

Finally, *Strahan* has been roundly criticized by scholarly commentators. *See, e.g.,* Jonathan H. Adler, *Judicial Federalism and the Future of Federal Environmental Regulation*, 90 IOWA L. REV. 377, 428–30 (2005) (analyzing *Strahan* and noting that "[i]f the state refrained from regulating gillnet and lobsterpot fishing altogether, the only way to mandate state enforcement of an anti-take prohibition would be to commandeer state officials"); Valerie Brader, *Shell Games: Vicarious Liability of State and Local Governments for Insufficiently Protective Regulations under the ESA*, 45 NAT. RESOURCES J. 103, 108 (2005) (criticizing *Strahan* for "appear[ing] to graft the federal government's affirmative duty to act to protect endangered species onto state and local governments that choose to regulate in areas that might affect endangered species" and "ignor[ing] the statutory structure that gave differing duties and powers to the federal and state governments"); James R. Rasband, *Priority, Probability, And Proximate Cause: Lessons From Tort Law About Imposing ESA Responsibility For Wildlife Harm On Water Users And Other Joint Habitat Modifiers,* 33 ENVT. L. 595, 625 (2003) (describing *Strahan*'s reasoning as "dubious not just as a matter of congressional intent but as a matter of causation"); J.B. Ruhl, *State and Local Government Vicarious Liability under the ESA*, 16 NAT. RESOURCES & ENV'T 70, 73 (ABA Fall 2001) ("[E]ven limited as the *Strahan* court suggested, and certainly if not so limited, the permitting and licensing basis of vicarious liability has no reasoned basis."). Because *Strahan* is not binding authority,

the plaintiff must demonstrate that *Strahan*'s reasoning is more persuasive than the many critics of that decision.  And the plaintiff must further demonstrate that *Strahan* is more persuasive than *Willis*, *Qualified Patients*, Judge Kozinski's concurrence in *Conant*, and Judge McConnell's dissent in *Wilderness Society*—all of which conclude that state officials *may* legalize or license activity that violates federal law.

## II.   THE CAUSAL LINK BETWEEN THE ISSUANCE OF WATER WITHDRAWAL PERMITS AND ANY EFFECTS ON THE WHOOPING CRANES IS FAR TOO ATTENUATED TO QUALIFY AS PROXIMATE CAUSATION

But-for causation between issuing permits for water withdrawals and harm to the whooping cranes is insufficient to qualify as a "take" under the Endangered Species Act.  *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 697 n.9, 700 n.13 (1995); *id.* at 709, 712–13 (O'Connor, J., concurring).  Instead, the prohibitions in the Endangered Species Act are "subject to . . . ordinary requirements of proximate causation and foreseeability."  *Id.* at 700 n.13 (majority opinion).  There is no liability under the Endangered Species Act for remote or unforeseeable harms to endangered animals.

The district court's findings of fact show at most a but-for causal link between the issuance of permits authorizing water usage and the alleged harms to whooping cranes.  Both the plaintiff and the district court proceeded on the assumption that "proximate" causation is needed only to connect the TCEQ's permitting decisions with the usage of water in the Guadalupe and San Antonio Rivers; once that step is

complete, but-for causation suffices to establish that the permitting decisions of TCEQ officials ultimately result in a "take" of a whooping crane. *See* USCA5.7048 (Pl. Post-Trial Br.) ("[P]roximate causation exists where a defendant government agency authorized the activity that caused the take."); *id.* at 7852 (Mem. Op.) ("Proximate causation exists where a defendant government agency authorized the activity that caused the take."). This is wrong, and it is flatly contradicted by the Supreme Court's pronouncement in *Sweet Home*. The plaintiff must prove that the TCEQ's permitting decisions "proximately" caused not only the diversions of water, but also the actual harm that befalls a member of the endangered whooping-crane flock. *See Sweet Home*, 515 U.S. at 700 n.13. The district court's opinion does not even attempt to argue that the causal relationship between the TCEQ's permitting decisions and the alleged harm to the whooping cranes satisfies the standards for proximate cause, and it could not have made this showing if it had tried.[11]

There are simply too many links in the chain of events that occur between the TCEQ's permitting decisions and the alleged harm to the whooping cranes—and too

---

[11] The district court's belief that proximate causation is needed only to connect the TCEQ's permitting decisions with the usage of water in the Guadalupe and San Antonio Rivers is a legal conclusion subject to de novo review. Whether a causal link is sufficiently direct to qualify as "proximate cause" is a question of fact. *See In re Signal Int'l LLC*, 579 F.3d 478, 490 n.12 (5th Cir. 2009). The district court's legal error in asserting that proximate causation is *per se* established whenever a government agency authorizes an activity that constitutes the but-for cause of harm to an endangered species should be reversed under the de novo standard of review. Had the district court actually considered whether the causal link between the issuance of the permits and harm to the whooping cranes was sufficiently direct to qualify as "proximate cause," its ultimate conclusion regarding proximate cause would be subject to review under the "clearly erroneous" standard. The district court, however, answered the wrong question—whether the chain of causation between the issuance of the permit and the taking of water from the rivers constitutes "proximate cause"—so its conclusion is entitled to no deference.

many intervening acts and events that affect the whooping-crane population. First, the TCEQ issues a permit allowing the withdrawal of water from the Guadalupe or San Antonio Rivers. Second, after the TCEQ issues a permit, the permit holder decides whether to draw water from the Guadalupe or San Antonio Rivers. Third, if the permit holder decides to draw water from one of the rivers, this may influence the saline content of the downstream water, but saline content is affected by many other factors (such as rainfall, tides, and climate) beyond the control of the TCEQ or the permit holders. There was, for example, a severe drought in the winter that preceded the alleged decrease in whooping-crane population. USCA5.4877–78, 4893 (Stehn); DX 136. Fourth, the increased saline content of the water affects the blue-crab population (according to the district court), USCA5.7843, but so do many other factors, such as temperature, tides, dissolved-oxygen levels, and commercial crab trapping. Fifth, according to the district court, the decreased availability of blue crabs and wolfberries caused the death of 23 whooping cranes during the winter of 2008-2009, *id.* at 7812–22, but many other factors can cause and contribute to deaths of whooping cranes, including their natural life cycle.

The causal chain in this case is extremely attenuated. It is more attenuated than the chain of events in *Palila v. Hawaii Dep't of Land & Natural Resources*, 852 F.2d 1106 (9th Cir. 1988) (*Palila II*), in which state officials grazed sheep that ate seeds that would have grown into habitat for endangered palila birds. Justice O'Connor's concurrence in *Sweet Home* expressly disapproved the Ninth Circuit's ruling in *Palila II*,

39

declaring that the causal connection between the sheep's consumption of the seeds and harm to palila birds was too remote to qualify as "proximate[]" cause. *Id.* at 713–14 (O'Connor, J., concurring). The plaintiff would have to insist that the Ninth Circuit was correct in *Palila* and that Justice O'Connor was wrong in *Sweet Home* to argue for "proximate causation" in this case. It would certainly be an aggressive move for this Court to embrace the Ninth Circuit's ruling in *Palila II* at the expense of Justice O'Connor's concurrence in *Sweet Home* when the *Palila II* opinion contains no analysis whatsoever of the proximate-causation question.

Indeed, the causal connection alleged in this case is more attenuated than *any* other case involving the Endangered Species Act that we have been able to uncover. In *Strahan*, for example, the endangered whales were caught directly in the fishing equipment that the state officials had licensed. In *Loggerhead Turtle*, the endangered sea turtles were directly affected by beachfront lighting that the local officials had allowed. Other cases cited by the plaintiff involve the use of traps or other devices that come into direct contact with endangered species. *See, e.g., Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1077 (D. Minn. 2008). In this case, by contrast, the TCEQ permits set in motion a long and complex chain of events that purportedly results in harm to the whooping cranes. If this case does not fall on the "too attenuated" side of the line, then it is impossible to imagine a case that would. The plaintiff has not cited any case that has found Endangered Species Act liability when the causal connection between

the alleged "take" and the alleged harm to the endangered species is as attenuated as it is in this case.[12]

The plaintiff has yet to acknowledge a point at which but-for causation becomes too attenuated to satisfy the proximate-causation and foreseeability requirements of *Sweet Home*.  Instead, the plaintiff says that "[t]he mere fact that an ecosystem is complex, and a plaintiff's evidence and expert testimony elucidate that complexity does not mean the causation is attenuated."  Response to Motion for Emergency Stay at 23.  The plaintiff seems to be suggesting that no chain of causation is too complex to establish proximate cause, once state officials have licensed an activity that eventually results in harm to an endangered species.  This is consistent with what the plaintiff argued in the district court,[13] but it is an utterly untenable construction of the Endangered Species Act.  This Court should endorse the analysis of proximate cause in Justice O'Connor's *Sweet Home* concurrence, reject the Ninth Circuit's ruling in *Palila II*, and reverse the district court's finding of proximate causation in this case.

---

[12] *See, e.g., Ctr. for Biological Diversity v. U.S. Dep't of Housing & Urban Dev.*, 359 F. App'x 781 (9th Cir. 2009) (per curiam) (holding that federal agencies that guarantee private loans were not liable under the Endangered Species Act because the relationship between the loan guarantees and harm to the species was too remote and indirect); *Strahan v. Linnon*, No. 97-1787, 1998 WL 1085817, at *4 (1st Cir. July 16, 1998) (per curiam) (holding that Coast Guard was not liable for whale takes committed by vessels it permitted to operate because "[t]he vessel owner or operator is an independent actor who is, himself, responsible for complying with environmental and other laws").

[13] *See* USCA5.7048 (Pl. Post-Trial Br.) ("[P]roximate causation exists where a defendant government agency authorized the activity that caused the take.").

## III.  THE DISTRICT COURT HAD NO AUTHORITY TO ORDER STATE OFFICIALS TO APPLY FOR AN INCIDENTAL TAKE PERMIT

The district court's memorandum opinion orders state officials to seek an Incidental Take Permit.  *See* USCA5.7856.  That is not a lawful remedy under the Endangered Species Act.  The statute allows courts to enjoin persons from taking an endangered species, *see* 16 U.S.C. § 1540(g)(1)(A), but courts cannot force a person— much less a state official—who has been enjoined from violating the Endangered Species Act to seek an Incidental Take Permit if he does not wish to do so.

An Incidental Take Permit allows the Secretary of the Interior to authorize a "taking" of an endangered species in certain limited situations.  *See* 16 U.S.C. § 1539(a).  This provides an escape valve for the absolute and cost-blind edicts that appear elsewhere in the Endangered Species Act.  *See, e.g.*, 16 U.S.C. § 1538(a)(1).  If a person's proposed course of action will "take" an endangered species, he must choose whether to seek an Incidental Take Permit from the Secretary or give up on his plans.  That decision, however, rests entirely with the person who encounters a roadblock from the Endangered Species Act; a federal court cannot make that decision for him.

Finally, it is not a violation of federal law to decline to seek an Incidental Take Permit from the Secretary, and under the Supreme Court's Eleventh Amendment doctrine, a state official may be enjoined in his official capacity only to "end a continuing violation of federal law."  *Seminole Tribe v. Florida,* 517 U.S. 44, 73 (1996)

(quoting *Green v. Mansour,* 474 U.S. 64, 68 (1985)).[14]   The plaintiff appeals to the "broad equitable powers of a federal court," *see* Response to Motion for Emergency Stay at 24, but ignores the fact that the Supreme Court's Eleventh Amendment and *Ex parte Young* doctrines impose strict limits on the ability of a federal court to enjoin a state official in his official capacity.   *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 114 n.25 (1984) ("The authority-stripping theory of *Young* is a fiction that has been narrowly construed.").   The only injunction that a federal court may enter against a state official is one that ends an ongoing violation of federal law.   *See, e.g.,* *Verizon*, 535 U.S. at 645; *Papasan v. Allain*, 478 U.S. 265, 276–79 (1986); *Green*, 474 U.S. at 68; *Quern v. Jordan*, 440 U.S. 332, 337 (1979).   Otherwise the federal court is entering injunctive relief against the State itself, rather than a rogue officer who is unable to claim the mantle of the State's sovereign immunity.   *See, e.g., Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011); *Pennhurst*, 465 U.S. at 100–03; *Ex parte Young*, 209 U.S. at 158–60.

The plaintiff's earlier briefing in this court did not acknowledge the Supreme Court's *Ex parte Young* doctrine, and did not present an argument that TCEQ officials would violate federal law by choosing not to apply for an Incidental Take Permit.   *See* Response to Motion for Emergency Stay at 24–26.   Instead, the plaintiff tried to

---

[14] The court in *Martin* did not "order" an ITP; rather the parties entered into a consent decree that they agreed would remain in effect until the State's application for an Incidental Take Permit was approved.   623 F.3d at 23.   *Martin* offers no support for the proposition that a federal court may order a state official to apply for an ITP, as the district court appeared to believe.   *See* USCA5.7837.

defend the district court by asserting that "[t]he ITP/HCP process has been ordered as a remedy to other state agencies by other federal courts." *See id.* at 25. The only case the plaintiff cited to support this claim is *Strahan*, which contains no discussion or analysis of how a judicial order to seek an Incidental Take Permit could be a lawful remedy in an Endangered Species Act case. *Strahan* merely affirmed a district-court injunction that, among other things, had ordered state officials to apply for an Incidental Take Permit, and never discussed that aspect of the district court's ruling. Decisions from courts of appeals outside of the Fifth Circuit have weight only to the extent they offer persuasive reasons for their decisions; *Strahan* provides no reasoning at all on this issue.[15]

## IV. THE DISTRICT COURT'S RULING VIOLATES THE ELEVENTH AMENDMENT BY PURPORTING TO ENTER DECLARATORY AND INJUNCTIVE RELIEF AGAINST TCEQ

The district court's memorandum opinion purports to enter declaratory and injunctive relief against "TCEQ." *See* USCA5.7856 (enjoining "TCEQ, its Chairman, and its Executive Director" from granting new water permits and ordering "TCEQ" to apply for an Incidental Take Permit). Yet the TCEQ was not named as a defendant in this case, and for good reason: State agencies cannot be sued in federal court absent their consent or a valid abrogation of state sovereign immunity. *See generally Seminole Tribe,* 517 U.S 44. The district court's memorandum opinion

---

[15] The opinion in *Holsten*, 541 F. Supp. 2d 1073, which the district court cited to support its unlawful injunction, is similarly bereft of reasoning on this point.

improperly enters declaratory and injunctive relief against a non-party, and violates the Eleventh Amendment (as well as the Endangered Species Act itself[16]) by entering this relief against a non-consenting state entity.

The plaintiff does not (and cannot) deny that the Eleventh Amendment prohibits federal courts from entering declaratory or injunctive relief against a non-consenting state agency. Instead, the plaintiff tries to pass off the Eleventh Amendment objection by arguing that the district court's reference to "TCEQ" is nothing more than "a shorthand for the 'TCEQ Official Defendants.'" *See* Response to Motion for Emergency Stay at 29. It is hard to accept this interpretation of the district court's order when it purports to enter relief against "the TCEQ, its Chairman, and its Executive Director." *See* USCA5.7856. If the district court were using "TCEQ" as shorthand for the "TCEQ Official Defendants," as the plaintiff claims, then what purpose is served by the additional reference to the TCEQ's "Chairman" and "Executive Director"?

In all events, the Supreme Court does not share the plaintiff's insouciance toward these matters. In *Alabama v. Pugh*, 438 U.S. 781, 781–82 (1978) (per curiam), the Justices summarily reversed the Fifth Circuit for affirming an injunction that named the State of Alabama and the Alabama Board of Corrections alongside a number of Alabama officials. The Court explained: "[T]he question of the State's

---

[16] *See* 16 U.S.C. § 1540(g)(1)(A) (authorizing citizen suits against governmental agencies "to the extent permitted by the eleventh amendment to the Constitution").

Eleventh Amendment immunity is not merely academic [because] Alabama has an interest in being dismissed from this action in order to eliminate the danger of being held in contempt if it should fail to comply with the mandatory injunction." *Id.* at 782. The plaintiff invites another summary reversal by asking this Court to overlook or rationalize the district court's patently improper entry of declaratory and injunctive relief against a state entity.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted.

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Solicitor General

JAMES P. SULLIVAN
EVAN S. GREENE
Assistant Solicitors General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel.]: (512) 936-1695
[Fax]: (512) 474-2697

*Counsel for Defendants-Appellants*

### CERTIFICATE OF SERVICE

Counsel hereby certifies that, on May 2, 2013, the foregoing brief was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, upon the following registered CM/ECF users:

James B. Blackburn, Jr.
Mary B. Conner
Charles W. Irvine
BLACKBURN CARTER, P.C.
4709 Austin Street
Houston, Texas  77004

David A. Kahne
LAW OFFICE OF DAVID A. KAHNE
2711 Main Street, Suite 105
Houston, Texas  77002

John J. Mundy
MUNDY FIRM, P.L.L.C.
8911 N. Capital of Texas Highway, Suite 2105
Austin, Texas  78759-7200

Charles P. Waites
JOHNSON, DELUCA, KURISKY & GOULD, P.C.
4 Houston Center, 1221 Lamar Street, Suite 1000
Houston, Texas  77010-3050

*Counsel for Plaintiff-Appellee*

Kenneth R. Ramirez
LAW OFFICES OF KEN RAMIREZ
111 Congress Avenue, Suite 400
Austin, Texas  78759

*Counsel for Intervenor Defendant-Appellant*
*Texas Chemical Council*

Edmond R. McCarthy, Jr.
JACKSON, SJOBERG, MCCARTHY & TOWNSEND, L.L.P.
711 W. 7th Street
Austin, Texas  78701

*Counsel for Intervenor Defendant-Appellant*
*San Antonio River Authority*

Aaron M. Streett
BAKER BOTTS, L.L.P.
1 Shell Plaza, 910 Louisiana Street
Houston, Texas  77002-4995

Evan A. Young
Molly J. Cagle
Carlos R. Romo
BAKER BOTTS, L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, Texas  78701-4078

Kathy E.B. Robb
HUNTON & WILLIAMS, L.L.P.
200 Park Avenue, 52nd Floor
New York, New York  10166

Edward F. Fernandes
HUNTON & WILLIAMS, L.L.P.
111 Congress Avenue, Suite 510
Austin, Texas  78701

Kathryn S. Snapka
SNAPKA LAW FIRM
606 N. Carancahua Street, Suite 1511
Corpus Christi, Texas  78401-0688

*Counsel for Intervenor Defendant-Appellant*
*Guadalupe-Blanco River Authority*

Counsel also certifies that, on May 2, 2013, the foregoing brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/.

Counsel further certifies that: (1) required privacy redactions have been made, 5TH CIR. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5TH CIR. R. 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

  /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants-Appellants*

CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

    [X]   this brief contains 12,622 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) or 5TH CIR. R. 32.2, *or*

    [  ]   this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

    [X]   this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2007* in *Garamond 14-point typeface*, or

    [  ]   this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

        /s/ Jonathan F. Mitchell
       Jonathan F. Mitchell
       *Counsel for Defendants-Appellants*

Dated:  May 2, 2013