NO. 13-40317

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

THE ARANSAS PROJECT,

*Plaintiff-Appellee*,

v.

BRYAN SHAW, in his official capacity as Chairman of the Texas Commission on Environmental Quality; BUDDY GARCIA, in his official capacity as Commissioner of the Texas Commission on Environmental Quality; CARLOS RUBINSTEIN, in his official capacity as Commissioner of the Texas Commission on Environmental Quality; MARK VICKERY, in his official capacity as Executive Director of the Texas Commission on Environmental Quality; AL SEGOVIA, in his official capacity as South Texas Watermaster,

*Defendants-Appellants,*

GUADALUPE-BLANCO RIVER AUTHORITY, TEXAS CHEMICAL COUNCIL; SAN ANTONIO RIVER AUTHORITY,

*Intervenor Defendants-Appellants.*

On Appeal from the United States District Court for the Southern District of Texas, Corpus Christi Division - Case No. 2:10-CV-075

## *AMICUS CURIAE* BRIEF IN SUPPORT OF APPELLEE AND AFFIRMATION OF THE DISTRICT COURT DECISION

Counsel of Record for *Amicus Curiae* Law Professors

Melinda Taylor
Kelly Haragan
Jeremy Brown
University of Texas School of Law
727 E. Dean Keeton
Austin, TX 78705
mtaylor@law.utexas.edu
512 459 5175

## STATEMENT OF COUNSEL FOR *AMICUS CURIAE*

In accordance with Fed. R. App. P. 29(c)(5), *amicus curiae* law professors state that no party or parties' counsel authored any part of this brief or paid any costs associated with its preparation or submission, and no person other than *amicus curiae*, its members, or its counsel, contributed money that was intended to fund preparing or submitting the brief.

This brief is submitted with the consent of all parties in accordance with Fed. R. App. P. 29(a) and the rules of this Court.

Respectfully submitted,

/s/ Melinda Taylor

Melinda Taylor
University of Texas School of Law
727 E. Dean Keeton
Austin, TX 78705
mtaylor@law.utexas.edu
512 459 5175

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for *Amicus Curiae* certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 may have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Appellee The Aransas Project ("TAP") is Plaintiff-Appellee.

2.    James B. Blackburn, Jr., Charles W. Irvine, and Mary B. Conner of Blackburn Carter, P.C. representing Appellee TAP.

3.    Jeffery Mundy of the Mundy Firm, PLLC, representing Appellee TAP.

4.    David A. Kahne of the Law Office of David A. Kahne representing Appellee TAP.

5.    Patrick Waites of Johnson, Deluca, Kurisky & Gould, P.C. representing Appellee TAP.

6.    Appellant Bryan Shaw, also referred to as a State Official Defendant at the trial court, is the Chairman of the Texas Commission on Environmental Quality.

7.    Appellant Carlos Rubinstein, also referred to as a State Official Defendant at the trial court, is a Commissioner of the Texas Commission on Environmental Quality.

8.    Appellant Toby Baker, also referred to as a State Official Defendant at the trial court, is a Commissioner of the Texas Commission on Environmental Quality. Mr. Baker replaced Commissioner Buddy Garcia.

9.    Appellant Mark Vickery, also referred to as a State Official Defendant at the trial court, was the Executive Director of the Texas Commission on Environmental Quality. Mr. Vickery has since retired and been replaced by Zak Covar.

10.    Appellant Esteban Ramos, also referred to as a State Official Defendant at the trial court, is the South Texas Watermaster. Mr. Ramos replaced Al Segovia as South Texas Watermaster.

11. Jonathan F. Mitchell, Solicitor General, Evan Scott Greene, and James Patrick Sullivan of the Texas Attorney General's Office, Appellant Counsel for State Official Appellants, Bryan Shaw, Toby Baker, Carlos Rubinstein, Mark Vickery, and Esteban Ramos.

12. Mark L. Walters, John R. Hulme, David Marshal Coover, III, and Cynthia Woelk of the Texas Attorney General's Office, Environmental Protection Division, Counsel for the State Official Appellants, Bryan Shaw, Toby Baker, Carlos Rubinstein, Mark Vickery, and Esteban Ramos.

13. Guadalupe-Blanco River Authority ("GBRA") – Intervenor Defendant - Appellant.

14. Molly Cagle, Evan Young,  Carlos R. Romo,  Aaron M. Streett of Baker Botts LLP, Appellate Counsel for GBRA, Intervenor Defendant - Appellant.

15. Edward F. Fernandes, Kathy Robb, Andrea W. Wortzel, Maida O. Lerner, Christopher Taylor, Patricia Acosta, and Thomas R. Julin of Hunton & Williams, LLP, Trial Counsel for GBRA, Intervenor Defendant - Appellant.

16. Kathryn Snapka of The Snapka Law Firm, Trial Counsel for GBRA, Intervenor Defendant - Appellant.

17. Bruce Wasinger, General Counsel for the GBRA, Intervenor Defendant - Appellant.

18. Texas Chemical Council ("TCC"), Intervenor Defendant –Appellant.

19. Kenneth R. Ramirez of the Law Offices of Ken Ramirez, Appellant Counsel for TCC, Intervenor Defendant - Appellant.

20. Amy Leila Saberian of Enoch Kever, PLLC, Appellant Counsel for TCC, Intervenor Defendant - Appellant.

21. San Antonio River Authority ("SARA"), Intervenor Defendant - Appellant.

22. Edmond R. McCarthy, Jr. of Jackson, Sjoberg, McCarthy & Townsend, LLP, Appellant Counsel for SARA, Intervenor Defendant - Appellant.

23. David W. Ross, Appellant Counsel for SARA, Intervenor Defendant - Appellant.

24. *Amicus Curiae* Texas Farm Bureau.

25.   *Amicus Curiae* American Farm Bureau Federation.

26.   *Amicus Curiae* Oklahoma Farm Bureau Legal Foundation.

27.   *Amicus Curiae* Oregon Farm Bureau Federation.

28.   *Amicus Curiae* Wyoming Farm Bureau Federation.

29.   *Amicus Curiae* California Farm Bureau Federation.

30.   *Amicus Curiae* Mississippi Farm Bureau Federation.

31.   *Amicus Curiae* Louisiana Farm Bureau Federation.

32.   Sydney W. Falk, Jr. and Douglas G. Caroom of Bickerstaff Heath Delgado Acosta, LLP, Counsel for *Amicus Curiae* Texas Farm Bureau, American Farm Bureau Federation, Oklahoma Farm Bureau Legal Foundation, Oregon Farm Bureau Federation, Wyoming Farm Bureau Federation, California Farm Bureau Federation, Mississippi Farm Bureau Federation, and Louisiana Farm Bureau Federation .

33.   *Amicus Curiae* Texas Water Conservation Association.

34.   Lyn E. Clancy of Lower Colorado River Authority, Counsel for *Amicus Curiae* Texas Water Conservation Association.

35.   *Amici Curiae* City of Kerrville.

36.   *Amicus Curiae* Structural Metals, Inc. d/b/a CMC Steel Texas.

37.   Amy M. Emerson of Lloyd Gosselink Rochelle & Townsend, P.C., Counsel for Amici Curiae City of Kerrville and Structural Metals, Inc. d/b/a CMC Steel Texas.

38.   *Amicus Curiae* Texas Public Policy Foundation.

39.   Mario Loyola and Josiah Neeley, Counsel for *Amicus Curiae* Texas Public Policy Foundation.

40.   *Amicus Curiae* City of Victoria.

41.   Michael J. Booth of Booth, Ahrens & Werkenthin, P.C., Counsel for *Amicus Curiae* City of Victoria.

iv

42.     *Amicus Curiae* CPS Energy.

43.     Russell S. Johnson, Carl R. Galant, and Regina M. Buono of McGinnis, Lochridge & Kilgore, LLP, Counsel for *Amicus Curiae* CPS Energy.

44.     Trial Court *Amicus Curiae*:

– Guadalupe Valley Electric Cooperative, Inc.

– Caldwell County.

– City of Port Lavaca.

– City of Boerne.

– City of Bulverde.

– City of Cibolo.

– City of Lockhart.

– City of Luling.

– City of San Marcos.

– City of Victoria.

– City of Yoakum.

– Fair Oaks Ranch.

– Foresight Golf Partners Ltd.

– Golf Associates Ltd.

– Guadalupe Basin Coalition.

– Guadalupe-Blanco River Authority Customers.

– Kendall County.

– Royal Marina Holdings, LLP.

– Royal Oaks Partners at Fulton Beach, LLP.

– SJWTX, Inc.

– Texas Water Conservation Association.

– Victoria County.

– National Water Resources Association.

– Comal County.

– Calhoun County.

– Guadalupe County, Texas.

– City of Wimberley, Texas, Mayor Bob Flocke.

– City of New Braunfels.

– East Central Special Utility District.

45.    Defenders of Wildlife as *Amicus Curiae*

46.    Jason C. Rylander, Michael P. Senatore, Eric R. Glitzenstein, counsel for *Amicus Curiae* Defenders of Wildlife

s/ Melinda Taylor

Melinda Taylor
**Counsel of Record for Amicus Curiae Law Professors**

**INTEREST OF *AMICUS CURIAE***

We, the below-listed law professors, teach and write extensively about natural resources and environmental law. We have an interest in ensuring the clear and consistent application of constitutional principles to environmental regulations. Based upon our review, we believe the Tenth Amendment does not bar the enforcement of the Endangered Species Act in general or the specific relief granted by the district court.

Hope Babcock
Professor of Law
Georgetown University Law Center

Reed Benson
Keleher & McLeod Professor
University of New Mexico School of Law

Lynn Blais
Leroy G. Denman, Jr. Regents Professor in Real Property Law
University of Texas School of Law

Jeremy Brown (Counsel of Record)
Research Fellow
University of Texas School of Law

Holly Doremus
James H. House and Hiram H. Hurd Professor of Environmental Regulation
University of California, Berkeley, School of Law

Gabriel Eckstein
Professor of Law
Texas Wesleyan School of Law

Victor Flatt
Thomas F. and Elizabeth Taft Distinguished Professor in Environmental Law
University of North Carolina School of Law

Kelly Haragan (Counsel of Record)
Lecturer
University of Texas School of Law

Amy Hardberger
Assistant Professor of Law
St. Mary's School of Law

Oliver Houck
Professor of Law
Tulane University Law School

John Leshy
The Harry D. Sunderland Distinguished Professor of Real Property Law
University of California, Hastings College of Law

Dave Owen
Associate Professor of Law
University of Maine School of Law

Patrick Parenteau
Professor of Law
Vermont Law School

Zygmunt Plater
Professor of Law
Boston College Law School

Daniel Rohlf
Associate Professor
Lewis and Clark Law School

Thomas McGarity
Joe R. and Teresa Lozano Long Endowed Chair in Administrative Law
University of Texas School of Law

Dan Tarlock
Distinguished Professor of Law
IIT Chicago-Kent College of Law

Melinda Taylor (Counsel of Record)
Senior Lecturer
University of Texas School of Law

Gerald Torres
Bryant Smith Chair in Law
University of Texas School of Law

Wendy Wagner
Joe A. Worsham Centennial Professor
University of Texas School of Law

Sandra Zellmer
Robert B. Daugherty Professor
University of Nebraska College of Law

# TABLE OF CONTENTS

Statement of Counsel for *Amicus Curiae* ........................................................ i

Certificate of Interested Persons .................................................................... ii

Interest of *Amicus Curiae* ............................................................................ vii

Table of Contents ......................................................................................... x

Table of Authorities ................................................................................... xii

Summary of Argument.................................................................................. 1

Argument....................................................................................................... 3

    I.     The ESA Does Not Fall Under the Commandeering
          Doctrine Because it is a Generally Applicable Law ................. 5

         A.     The Commandeering Doctrine Does Not Apply
               to Generally Applicable Laws ........................................ 5

         B.     Section 9 is a Generally Applicable Law......................... 6

         C.     Generally Applicable Laws Constrain the Activities
               of Public and Private Entities........................................... 7

         D.     The District Court Order Merely Enforces the
               Generally Applicable Section 9 ..................................... 10

    II.    The Commandeering Doctrine Does Not Apply Because
          Section 9 Does Not Regulate the State as a Sovereign ........... 13

         A.     The ESA Regulates State Activities ............................... 14

1.      The TCEQ Water Permitting System is a
        State Activity ...................................................... 14

2.      Traditional State Responsibility for Managing
        In-State Water Resources is Not the Same as
        Sovereign Conduct for Purposes of a
        Commandeering Analysis .................................... 15

3.      State Regulations that Affect Endangered
        Species May be Intended to Accomplish
        Goals Other than to Protect Endangered
        Species ................................................................ 18

III.    The ESA Complies with the Commandeering Doctrine .......... 20

A.      The Federal Government May Encourage States
        by Allowing Them to Either Run Programs that
        Meet Federal Standards or be Preempted ...................... 21

B.      The ESA Encourages States to Operate State-
        Level Programs ............................................................. 21

C.      Because the State Has Failed to Protect Whooping
        Cranes According to Federal Standards, the ESA
        Must Preempt ................................................................ 25

Conclusion ................................................................................................ 31

Certificate of Service ................................................................................ 35

Certifications Under ECF Filing Standards ................................................. 37

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Cmty. Orgs. for Reform Now v. Edwards*, 81 F.3d 1387 (5th Cir. 1996)............................................................................. 29

*Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007)......................................................................... 21

*Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540 (D. Md. 2009) ............................................................. 10, 11

*Aransas Project v. Shaw*, 2013 U.S. Dist. LEXIS 33258 (S.D. Tex. Mar. 11, 2013) ............................................... 3, 12, 18, 26

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995)...................................................................... 13, 25

*Carson-Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257 (9th Cir. 1984) .......................................................................... 17

*Cetacean Cmty. v. Bush*, 386 F.3d 1169 (9th Cir. 2004)............................... 7

*City of Abilene v. EPA*, 325 F.3d 657 (5th Cir. 2003) ...................... 3, 23, 32

*Coho Salmon v. Pac. Lumber Co.*, 61 F. Supp. 2d 1001 (N.D. Cal. 1999)................................................................................... 7

*Envtl. Def. Ctr. v. EPA*, 344 F.3d 832 (9th Cir. 2003) .................................................................................. 30

*FERC v. Mississippi*, 456 U.S. 742 (1982).................................................... 9

*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)............... 8

*GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003)............ 11, 21

*Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000) ............................................. 22

*Hearts Bluff Game Ranch v. State*, 381 S.W.3d 468 (Tex. 2012) ................ 19

*Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264
    (1981) .................................................................................................. 17

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 896 F. Supp.
    1170 (M.D. Fla. 1995) ............................................................. 12

*Mackey v. Montrym*, 443 U.S. 1 (1979)......................................................... 17

*Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060 (9th Cir. 1996)........................ 10

*Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041 (D.C. Cir.
    1997) ................................................................................................... 22

*Nebraska v. EPA*, 331 F.3d 995 (D.C. Cir. 2003) ........................................ 15

*New York v. United States*, 505 U.S. 144 (1992)....................................*passim*

*Palila v. Haw. Dep't of Land & Natural Res.*, 471 F. Supp.
    985 (D. Haw. 1979) .................................................................................. 4

*Printz v. United States*, 521 U.S. 898 (1997)........................................*passim*

*Reno v. Condon*, 528 U.S. 141 (2000) ................................................ 6, 14, 15

*Riverside Irrigation Dist. v. Andrews*, 758 F.2d 508 (10th Cir.
    1985) ................................................................................................... 16

*San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163

(9th Cir. 2011) ....................................................................... 21

*Seattle Audubon Soc'y v. Sutherland*, 2007 U.S. Dist. LEXIS 31880
    (W.D. Wash. May 2, 2007) ................................................ 4, 27

*South Carolina v. Baker*, 485 U.S. 505 (1988) ............................... 9

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ..................... *passim*

*Swan View Coal. v. Turner*, 824 F. Supp. 923 (D. Mont. 1992) ................. 25

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) .......................... 11

*United States v. City of Rancho Palos Verdes*, 841 F.2d 329 (9th Cir.
    1988) ........................................................................... 7

*United States v. Glenn-Colusa Irrigation Dist.*, 788 F. Supp. 1126
    (E.D. Cal. 1992) ........................................................ 25, 26

*United States v. Smith*, 2013 U.S. App. LEXIS 5726 (5th Cir.
    Mar. 22, 2013) ............................................................. 17

*Wyoming v. Dep't of Interior*, 360 F. Supp. 2d 1214 (D. Wyo.
    2005) .................................................................. 4, 26, 27

## STATUTES

16 U.S.C. § 1532(13) ...................................................... 6

16 U.S.C. § 1532(19) ...................................................... 5

16 U.S.C. § 1535(c)(1)(B) ............................................... 23

16 U.S.C. § 1538(a)(1)(B) ................................................. 6

16 U.S.C. § 1539(a) ........................................................................ 8

16 U.S.C. § 1535(c)(1)(A) ............................................................ 22

16 U.S.C.S. § 1531(c)(2) .............................................................. 22

16 U.S.C.S. § 1535(d)(2) .............................................................. 24

The Occupational Safety and Health Act of 1970, 84 Stat. 1590,
    29 U.S.C. § 651 et seq. ........................................................... 20

Clean Water Act, 86 Stat. 816, as amended,
    33 U.S.C. § 1251 et seq. ......................................................... 20

Tex. Parks & Wild. Code §§ 83.011–83.020 ............................... 25

Tex. Water Code § 11.021(a) ....................................................... 15

Tex. Water Code § 11.0235(a) ..................................................... 16

Tex. Water Code § 11.302 ........................................................... 16

## LEGISLATIVE HISTORY

H.R. Rep. 93-412, at 10 (1973) ...................................................... 7

S. Rep. No. 93-307 (1973) .............................................................. 7

## OTHER AUTHORITIES

Appellants' Brief for State Defendants ........................................ 11

Brief of the TPPF as *Amicus Curiae* Supporting Defendants-
    Appellants Supporting Reversal ...................................... *passim*

Bureau of Reclamation, U.S. Dep't of Interior, *Water 2025: Preventing Conflict and Crisis in the West* (2003) ................................. 16

FWS & FWCC, *Cooperative Agreement Between the United States FWS and the Florida FWCC for the Conservation of an Endangered and Threatened Fish and Wildlife* (2012) ........................... 23

FWS & NOAA, *Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy Regarding the Role of State Agencies in Endangered Species Act Activities* (1994) ................. 22

FWS, *FY 2012 Cooperative Endangered Species Conservation Fund: Project Description by State* (2012), *available at* http://tinyurl.com/k4qrzhg ........................................................ 24

FWS, *Spotlight Species Action Plan* (April 7, 2009), *available at* http://tinyurl.com/oncnu88 ........................................................ 24

J.B. Ruhl, *State and Local Government Vicarious Liability Under the ESA*, 16 Nat. Res. & Env't 70 (2001) ................................................ 28

Jonathan H. Adler, *The Revival of Federalism at Its Implications for Environmental Law*, 6 Geo. Mason L. Rev. 573 (1998) ........................ 11

Kaush Arha & Barton H. Thompson, Jr., eds., *The Endangered Species Act and Federalism* 11 (2011) ............................................. 25, 26

Reed Benson, *Deflating the Deference Myth*, 2006 Utah L. Rev. 241 (2006) ............................................................................ 16

Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321 (2000) ........................ 12

Texas Water Development Board, *Water for Texas: 2012 State Water Plan* (January 2012) ...................................................... 19

*The Federalist* Nos. 79-82 (Alexander Hamilton) ........................................ 12

USFWS, *HCP Handbook* (1996), *available at*
       http://tinyurl.com/lnorzc3 ......................................................................... 8

## SUMMARY OF ARGUMENT

The district court had authority to enjoin the State of Texas (State) from continued violations of the Endangered Species Act.   The State and *amicus curiae* Texas Public Policy Foundation (TPPF) have argued the district court's order violated the Tenth Amendment prohibition on commandeering.   This brief responds to those arguments. It explains that, while the Tenth Amendment protects against federal overreach, the district court did not overreach; its injunction was tailored to prevent the State from further causing the illegal take of endangered whooping cranes through its water management system. The State retains the authority to choose the appropriate means to minimize harm to the whooping crane, as required by the ESA, consistent with the goals of the State's water management program.

Under the ESA, states are prohibited from engaging in actions which foreseeably cause "take" of endangered species, such as the whooping crane, unless the take has been authorized by an "incidental take" permit.   The district court found that the State's unconstrained licensing of water withdrawals from the San Antonio and Guadalupe rivers caused harm to the whooping crane, and therefore violated the ESA.

Courts have rejected Tenth Amendment challenges in similar situations and consistently found that the ESA does not commandeer state governments. Based on principles articulated by Supreme Court in cases involving Tenth Amendment challenges, there are three independent reasons the district court order in this case conforms to the Tenth Amendment. The first is that the commandeering doctrine does not constrain laws that apply equally to public and private entities, as the ESA does. The second is that the doctrine does not apply if the federal government does not infringe on state sovereignty; in this case, the ESA and the district court order apply to the State as the owner of surface water resources, rather than as a sovereign authority. The third is that the doctrine recognizes that federal law preempts state laws that fall short of required minimum federal standards. Here, the State's water and wildlife regulations did not measure up to the federal requirements.

**ARGUMENT**

In its decision below, the district court enforced the Endangered Species Act, 16 U.S.C. §1531 et seq (ESA), by granting two forms of relief.  First, it enjoined the Texas Commission on Environmental Quality (TCEQ) from approving new water permits affecting the Guadalupe or San Antonio Rivers until the state provided "reasonable assurance" the permits would not take whooping cranes in violation of the ESA.  *Aransas Project v. Shaw*, 2013 U.S. Dist. LEXIS 33258, at *205 (S.D. Tex. Mar. 11, 2013).  Second, the court directed the TCEQ to apply for an Incidental Take Permit (ITP), which requires a Habitat Conservation Plan (HCP).  *Id*. at 205.

The State and TPPF contend that through this relief the district court attempted to commandeer the machinery of Texas government, in violation of Tenth Amendment federalist principles.  This construction of the commandeering principle is misplaced.  The ESA and the district court decision do not raise Tenth Amendment issues.    The commandeering doctrine prohibits the federal government from making the state a conduit for the exercise of federal power.  *New York v. United States*, 505 U.S. 144, 161 (1992).  It does not prevent the federal government from asserting its authority to protect endangered species from harm caused by actors, including states, covered by the act.  *Strahan v. Coxe*, 127 F.3d 155, 170 (1st Cir. 1997).

3

The federal government, through its exclusive jurisdiction over interstate commerce and foreign treaties, has prohibited all actors, including states, from engaging in actions which foreseeably cause "takes" of an endangered species such as the whooping crane. The district court found the State's unconstrained licensing of water withdrawals from the San Antonio and Guadalupe rivers to do just that.

In their interpretation and application of the commandeering doctrine, the State and TPPF have presented that doctrine as being more broadly applicable than it actually is. In fact, the courts that have considered the issue have consistently concluded that the commandeering doctrine does not block ESA enforcement. *Strahan*, 127 F.3d at 170 ; *Seattle Audubon Society v. Sutherland*, 2007 U.S. Dist. LEXIS 31880, at *43 (W.D. Wash. May 2, 2007); *Wyoming v. Dep't of Interior*, 360 F. Supp. 2d 1214, 1244 (D. Wyo. 2005), *aff'd*, 442 F.3d 1262 (10th Cir. 2006)). *See also Palila v. Haw. Dep't of Land & Natural Res.*, 471 F. Supp. 985, 995 (D. Haw. 1979) ("the Tenth Amendment does not restrict enforcement of the Endangered Species Act"), *aff'd* 639 F.2d 495 (9th Cir. 1981).

Under the commandeering doctrine, "the Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). There are, however, "a variety of methods by which Congress may urge a State to

adopt a legislative program consistent with federal interests." *New York*, 505 U.S. at 144. Three of these methods independently validate both the ESA and the district court order enforcing it.

The first is that the federal government may direct state conduct through laws of general applicability. The second is that the federal government may regulate state activities so long as it does not regulate the states in their sovereign capacities. The third is that the federal government may encourage a state to regulate in a particular manner by allowing that state to either develop a regulatory program that meets federal standards or to be federally preempted. The three sections below address each of these exceptions in turn and explain the reasons that the Tenth Amendment does not preclude the district court relief.

## I. THE ESA DOES NOT FALL UNDER THE COMMANDEERING DOCTRINE BECAUSE IT IS A GENERALLY APPLICABLE LAW

### A. The Commandeering Doctrine Does Not Apply to Generally Applicable Laws

In *New York* and *Printz*, the Supreme Court articulated the commandeering doctrine. 505 U.S. at 144; 521 U.S. at 898. The Court in *New York* wrote that the Tenth Amendment is not an issue in cases that concern "generally applicable laws." 505 U.S. at 160. The Court has defined "generally applicable laws" as those that "subject[] a State to the same legislation applicable to private parties,"

*id*. at 160, or that "apply to individuals as well as States," *Reno v. Condon*, 528 U.S. 141, 151 (2000).

## B. Section 9 is a Generally Applicable Law

The ESA prohibition on "take" – Section 9, codified at 16 U.S.C. § 1538 – is a "generally applicable law."  It applies equally to private and public entities and prohibits "any person" from "taking" an endangered species.   16 U.S.C. § 1538(a)(1)(B).  The act defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. at § 1532(19).  It defines "person" as "an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States." *Id*. at § 1532(13).

Congress intentionally chose to define "person" broadly.   Precursor legislation to the ESA followed a narrower approach.  The Endangered Species Preservation Act of 1966 defined it to mean "any individual, partnership, corporation, or association."  Section 5(a), Pub. L. No. 89-669, 80 Stat 929.  The Endangered Species Conservation Act of 1969 expanded the definition to include the word "firm."  The definitions in both the 1966 and 1969 acts encompassed only

private-sector entities and restricted the scope of their associated substantive provisions accordingly. *United States v. City of Rancho Palos Verdes*, 841 F.2d 329, 331 (9th Cir. 1988).

With the ESA, Congress further expanded the definition by adding "any officer, employee, agent, department, or instrumentality of the Federal government, of any State or political subdivision thereof or any foreign government." The legislative history notes that the new definition was "broad[] enough to cover any person or entity, including employees of state or Federal agencies." H.R. Rep. 93-412, at 10 (1973).

With its clear wording and wide sweep, the definition of "person" has required little judicial interpretation. When courts have considered the definition, they have done so in the context of which "persons" have standing rather than which "persons" are subject to the ESA. *E.g.*, *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1177-78 (9th Cir. 2004) (finding that an endangered animal is not a "person"); *Coho Salmon v. Pac. Lumber Co.*, 61 F. Supp. 2d 1001, 1007 (N.D. Cal. 1999) (finding that an environmental nonprofit is).

## C. Generally Applicable Laws Constrain the Activities of Public and Private Entities

TPPF argues that the district court's order would impermissibly intrude on the State's regulatory authority over water withdrawals by prescribing specific

standards. In fact, the district court did not order the state to include any particular measures in state water permits to protect the whooping crane. The court's directive that TCEQ apply for an ITP, which requires preparation of an HCP, preserved TCEQ's discretion with respect to administering its water permitting program. HCPs are flexible tools, intended to promote "flexibility and ingenuity" and to "encourage 'creative partnerships' between the public and private sectors and state, municipal, and Federal agencies in the interests of endangered and threatened species and habitat conservation." USFWS, *HCP Handbook* 1-2 (1996), *available at* http://tinyurl.com/lnorzc3 (citing H.R. Rep. No. 97-835, 97th Congress, Second Session). The State will retain flexibility in designing the terms of the HCP, provided that the program it designs meets the requirements of the ESA and minimizes harm to the whooping crane. 16 U.S.C. § 1539(a). The mere fact that compliance with the ESA may require the TCEQ to amend its permitting program does not offend the Tenth Amendment.

In *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 557 (1985), the Court found that Congress could impose the requirements of the Fair Labor Standards Act (FLSA) on state and local governments in addition to private business. In a later case, the Court observed that complying with the FLSA post-*Garcia* required state and local governments to take administrative and legislative

8

actions to change their employment practices and to raise the funds needed to meet heightened pay standards. *South Carolina v. Baker*, 485 U.S. 505, 515 n.8 (1988).

In *South Carolina v. Baker*, the Court rejected a Tenth Amendment challenge to a legislative provision in the Tax Equity and Fiscal Responsibility Act of 1982 that eliminated tax exemptions for long-term municipal bonds that were not issued in registered form. 485 U.S. at 515. The provision did not dictate that states take certain actions, but South Carolina and the National Governors Association claimed it commandeered because it compelled states to issue bonds in registered form and required many states to amend statutes and to develop new systems for issuing registered bonds. *Id*. at 513  The Court observed that "such 'commandeering' is, however, an inevitable consequence of regulating a state activity. *Id.* at 514. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is commonplace and presents no constitutional defect." *Id*. at 514-15. *See also FERC v. Mississippi*, 456 U.S. 742, 771 (1982) (upholding a Public Utility Regulatory Policies Act of 1978 provision requiring state utility commissions to promulgate rules promoting cogeneration).

### D. The District Court Order Merely Enforces the Generally Applicable Section 9

The State has attempted to frame its Tenth Amendment challenge as being against the district court's remedy rather than against Section 9 itself. Similarly, the TPPF has conceded that the ESA is a generally applicable law but argued that the district court's analysis "led it to apply ESA § 9 in such a way that the provision ceased to be a law of general applicability with incidental impacts on the states, and became instead a way of dragooning Texas into implementing federal policy as a mere deputy of the federal government." Brief of the TPPF as *Amicus Curiae* Supporting Defendants-Appellants Supporting Reversal at 3.

This reasoning ignores the crucial distinction between a generally applicable law and the enforcement of that law. Remedies by their nature are rarely generally applicable – they flow from the application of law to unique facts and are specifically crafted to resolve a dispute. *New York*, 505 U.S. at 179 ("the power of federal courts to enforce federal law thus presupposes some authority to order state officials to comply"). Courts may have to exercise creativity to craft remedies that effectively address violations, as for instance by enjoining ESA defendants from continuing to engage in activities that take endangered species. *E.g.*, *Marbled Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060, 1068 (9th Cir. 1996) (affirming district court order that enjoined a lumber company from logging because there was a reasonable certainty the activities would take marbled murrelets); *Animal*

10

*Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540, 581 (D. Md. 2009) (enjoining defendant energy companies from building or operating wind turbines until they obtained an ITP).

While the Tenth Amendment plays a role in preventing all branches of federal government from intruding onto state sovereignty, *Strahan*, 127 F.3d at 169, courts have applied the commandeering doctrine almost exclusively to legislation and regulation. *See* Jonathan H. Adler, *The Revival of Federalism at Its Implications for Environmental Law*, 6 Geo. Mason L. Rev. 573, 583-13 (1998) (surveying commandeering case law). Moreover, both the State and TPPF have failed to identify a single case in which a court found the doctrine prohibited a particular judicial remedy. Appellants' Brief for State Defendants at 27-30; Brief of TPPF at 1-14.

The commandeering doctrine is intended to prevent Congress from seizing control of state governments, not to prevent federal courts from requiring states to comply with federal laws that themselves have survived past facial and as-applied challenges. *See, e.g.*, *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978); *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003). In attempting to impose a doctrine that has evolved practically, if not formally, into a check on Congressional and agency overreach onto the judiciary, the State and TPPF have confused the roles of courts and legislatures and the laws and principles that govern each. *E.g.*,

*The Federalist* Nos. 79-82 (Alexander Hamilton). In effect, the State and TPPF have attempted to use the Tenth Amendment to mount an as-applied challenge against a judicial remedy rather than against a statute or regulation. *See* Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1321-22 (2000) (defining as-applied challenges as being against statutes).

The analysis that the TPPF puts forward sidesteps the inconvenient fact that the district court would not have entered an injunction in this case at all if it had not found that the State violated Section 9 of the ESA by managing its water permitting program in a way that was the proximate cause of harm to the whooping crane. *Aransas*, 2013 U.S. Dist. LEXIS 33258, at *179. At that point, the district court did not enjoin TCEQ to revise its regulations. Rather, it ordered the remedy that is provided for in the ESA and that was similar to remedies other courts have ordered. *See E.g. Strahan*, 127 F.3d at 158 (upholding a district court order affirmatively enjoining Massachusetts to develop a proposal for restricting the use of fixed-fishing gear); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 896 F. Supp. 1170, 1183 (M.D. Fla. 1995) (enjoining a county from permitting beach driving that was found to take endangered turtles), *rev'd in part* 148 F.3d 1231 (holding that the district court had erred by concluding that it did not have

authority to order the county to also restrict artificial lighting that contributed to takes).

By managing its water resources in a way that proximately caused a take of the endangered whooping crane, the State violated Section 9 of the ESA, making the court's injunction appropriate. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 713 (1995) (O'Connor, J., concurring) (recognizing that entities violate Section 9 only if they proximately cause takes, and explaining by way of example that "the landowner who drains a pond on his property, killing endangered fish in the process, would likely satisfy any formulation of the principle.").

## II. THE COMMANDEERING DOCTRINE DOES NOT APPLY BECAUSE SECTION 9 DOES NOT REGULATE THE STATE AS A SOVEREIGN

Section 9 and the district court decision qualify for another exemption for laws that regulate states as actors rather than as sovereigns. In *Baker*, the Supreme Court observed that the Tenth Amendment permits federal laws that "regulate[] state activities but it prohibits federal laws that "seek to control or influence the manner in which States regulate private parties." *Id*. at 514. The line between laws that "regulate[]" and those that "seek to control or influence" is not always clear, but the word "seek" offers some guidance. It suggests a measure of intent or purposefulness. Federal laws that "regulate[] state activities" could permissibly

"influence the manner in which States regulate private parties" if they did not "seek" to do so. The ESA is such a law: Section 9 is generally applicable, as discussed above, and does not require states, in their sovereign capacity, to regulate their residents in a specifically dictated manner.

The Supreme Court has found that even a federal law that is not generally applicable and that applies only to states may "regulate[] state activities" without regulating states as sovereigns. In *Reno*, the Court upheld provisions in the Driver's Privacy Protection Act (DPPA) of 1994 that prohibited state department of motor vehicle (DMV) employees from knowingly disclosing personal information obtained through motor vehicle records. 528 U.S. at 143. South Carolina challenged the provisions and argued they would "thrust upon the States all of the day-to-day responsibility for administering its complex provisions" and thereby make "state officials the unwilling implementors of federal policy." *Id*. at 150-51. The Court disagreed, reasoning that the DPPA regulated the states only as "owners of databases." *Id*. at 151. Similarly, in this case the ESA applies to the state as the owner of surface water resources.

## A. The ESA Regulates State Activities

### 1. The TCEQ Water Permitting System is a State Activity

Section 9 and the district court order enforcing it are analogous to the DPPA upheld in *Reno*. In both cases, an arm of state government managed a state-owned

14

resource for which there was third–party demand – in *Reno*, it was the DMV and personal information, in this case, it was the TCEQ and water in the San Antonio and Guadalupe river basins. In both cases, federal statutes prohibited the state from engaging in certain conduct – in *Reno*, it was sharing personal information; in this case, it was taking whooping cranes (or by extension, issuing new water permits would proximately cause takes).

The *Reno* court explained: "[T]he DPPA does not require the States in their sovereign capacity to regulate their own citizens. The DPPA regulates the States as the *owners* of databases." 528 U.S. at 151 (italics added). Like the states in *Reno*, the State of Texas comes to this case as an owner. It owns "the ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico, and the storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state." Tex. Water Code § 11.021(a). *See also Nebraska,* 331 F.3d at 999 (finding a federal arsenic rule did not commandeer because it "regulate[d] the states only in their capacity as public water system owners.").

### 2. Traditional State Responsibility for Managing In-State Water Resources is Not the Same as Sovereign Conduct for Purposes of a Commandeering Analysis

By some measures, the federal government has traditionally deferred to states in the allocation and administration of water within their borders. Bureau of

Reclamation, U.S. Dep't of Interior, *Water 2025: Preventing Conflict and Crisis in the West* 31 (2003). The traditional role of states in managing water resources could perhaps be viewed as evidence that, in doing so, states act in their sovereign capacity. And certainly the State has claimed public trust ownership over surface water within its borders and must rely upon its police power to manage that water. Tex. Water Code §§ 11.0235(a), 11.302.

But states do not enjoy unfettered control over water. Reed Benson, *Deflating the Deference Myth*, 2006 Utah L. Rev. 241, 254-55 (2006) ("Although the Supreme Court has sometimes hinted that such limitations may exist, it has never held that state authority over water resources precludes the exercise of federal power."). States must manage their water in accord with federal laws like the Clean Water Act and the ESA, and numerous courts have issued decisions requiring states to modify their water programs. In *Riverside Irrigation Dist. v. Andrews*, 758 F.2d 508 (10th Cir. 1985), for instance, the Tenth Circuit upheld a decision by the Army Corps of Engineers to deny a nationwide permit for the deposit of dredge material for the construction of a dam and reservoir on a tributary of the South Platte River. The Corps had concluded the new reservoir would increase the consumptive use of water and reduce stream flows, endangering a critical habitat for the whooping cranes that stop there when migrating between Texas and Canada. The court found the denial was proper even

16

if it impaired Colorado's right to allocate water within its jurisdiction.  *Id*. at 513.

*See also*, *Carson-Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 262

(9th Cir. 1984).

Drivers' license information, as in *Reno*, is for purposes of a commandeering

analysis much the same as water.  States have a well-established police power to

regulate the use of motor vehicles.  *E.g., Mackey v. Montrym*, 443 U.S. 1, 17

(1979).  Yet state regulations must still meet federally imposed minimum

standards.  *United States v. Smith*, 2013 U.S. App. LEXIS 5726, at *14-16 (5th Cir.

Mar. 22, 2013).

*Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981),

offers a similar example.  In that case, the Supreme Court rebuffed a Tenth

Amendment challenge to two provisions of the Surface Mining Control and

Reclamation Act of 1977 (SMCRA) establishing mine site performance standards

for steep-slope operators.  The district court concluded the provisions

commandeered because they required states to regulate land use according to

federal standards.  The Court held that, even if the provisions intruded upon

traditional state functions, they did not commandeer because they did not "directly

compel[]" states to "enact and enforce a federal regulatory program."  *Id*. at 288.

"The most that can be said," the Court explained, "is that the [SMCRA] establishes

a program of cooperative federalism that allows the States, within limits

established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Id*. at 289.

That regulating drivers' license information or steep-slope mining – or water – generally falls to the states does not mean that such regulation amounts to a sovereign act or frees states from having to comply with federal standards. The district court order did not mandate that TCEQ manage San Antonio and Guadalupe water in a particular manner; it simply held that, because TCEQ has chosen to manage water from those rivers, the agency must do so in a way that does not violate the ESA.

### 3. State Regulations that Affect Endangered Species May be Intended to Accomplish Goals Other than to Protect Endangered Species

The district court cited the First Circuit decision in *Strahan* to support the conclusion that "ESA prohibitions apply to actions by state agencies where their regulatory programs approve actions by third parties that contribute to causing the take." *Aransas*, 2013 U.S. Dist. LEXIS 33258, at *20. In *Strahan*, the First Circuit upheld the portion of a district court decision directing Massachusetts to apply for an ITP (and in the process prepare an HCP) for Northern Right whales taken as a result of state fixed-fishing gear regulations. 127 F.3d at 158. The *Strahan* defendants had argued that the lower court opinion "suggests that the Commonwealth must make the choice of either not regulating in a particular area

18

or risking the federal government's commandeering its regulatory processes if it chooses to regulate." *Id.* at 169.

TPPF repeats this argument in the current appeal and contends that, under *Strahan*, states only bring themselves into the orbit of federal oversight if they affirmatively regulate an area; if states refrain from regulating, they place themselves beyond the reach of federal laws, such as the ESA, and the responsibility for compliance that comes with that. TPPF. at 12. Under this line of thinking, states have a perverse incentive to avoid regulating that is at odds with the ESA's stated policy. *Id*. at 12.

The argument that *Strahan* (or a similarly decided case) creates incentives that subvert the ESA may contain some conceptual appeal but has no practical resonance. No matter the holding this Court reaches, Texas will continue to manage the San Antonio and Guadalupe rivers and perhaps even do so more actively than it has in the past. To manage surface water resources, Texas has been issuing appropriation permits for more than a century. It has built an extensive network of dams, reservoirs, canals, and diversions. *E.g.*, *Hearts Bluff Game Ranch v. State*, 381 S.W.3d 468, 471-73 (Tex. 2012). In the coming decades, population growth is projected to increase demand for water. Texas Water Development Board, *Water for Texas: 2012 State Water Plan*, xii (January 2012). The State will likely need to manage its resources even more carefully. In doing

so, it will have to comply with Section 9. Such compliance will require the State to be mindful of endangered species laws but will not require the State to repurpose its surface water program as an endangered species protection program.

## III. THE ESA COMPLIES WITH THE COMMANDEERING DOCTRINE

Section 9 and the district court decision satisfy the two-option test set forth in *New York*. There, the Court observed that there were a "variety" of exceptions to the commandeering doctrine but that two were of "particular relevance" to the Low-Level Radioactive Waste Policy Amendment Act of 1985 provisions at issue. *New York*, 505 U.S. at 167. The federal government could urge states to adopt legislative programs that advanced federal interests by (1) enticing them with conditional federal funds or (2) giving them a choice between being preempted and implementing programs in a way that satisfies federal standards. *Id.* at 167. The latter option has often been dubbed "cooperative federalism" and has found expression through such laws as the Clean Water Act, 86 Stat. 816, as amended, 33 U. S. C. § 1251 et seq. and the Occupational Safety and Health Act of 1970, 84 Stat. 1590, 29 U. S. C. § 651 et seq. *New York*, 505 U.S. at 167-68.

Certain environmental statutes such as the Clean Water Act include mechanisms by which the federal government can delegate authority to states to administer federal regulatory requirements. The ESA's structure is different.

Section 6 of the ESA provides that states may formulate their own endangered species programs which, if they conform to the ESA's standards, will apply in place of the ESA. Texas has not formulated such a comprehensive endangered species program, so the ESA applies.

### A. The Federal Government May Encourage States by Allowing Them to Either Run Programs that Meet Federal Standards or be Preempted

If Congress has authority to regulate private activity under the Commerce Clause, it may offer states the choice of regulating that activity according to federal standards or having federal law preempt. *New York*, 505 U.S. at 167. But the federal government may not coerce states by presenting an alternative to preemption that is simply another form of federal regulation. *Id.* at 176. The alternative choice may be burdensome or unappealing and still not run afoul of the Tenth Amendment. As this Court has observed, "the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation." 325 F.3d at 662.

### B. The ESA Encourages States to Operate State-Level Programs

The ESA represents a valid exercise of Commerce Clause authority, *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163 (9th Cir. 2011); *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007); *Nat'l Ass'n of Home*

*Builders v. Babbitt*, 130 F.3d 1041 (D.C. Cir. 1997); *Gibbs v. Babbitt*, 214 F.3d 483. The act was designed to embody a spirit of cooperative federalism. In passing it, Congress recognized the importance of "encouraging the States … to develop and maintain conservation programs which meet national and international standards." 16 U.S.C.S. § 1531(a)(5). Congress instructed the Department of Interior and the Department of Commerce to "cooperate to the maximum extent practicable with the States." *Id.* at § 1535(a). *See also* FWS & NOAA, *Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy Regarding the Role of State Agencies in Endangered Species Act Activities* (1994). Recognizing the centrality of water resources – a traditional matter of state concern – to the purposes of the ESA, Congress declared in the act that as a matter of policy "Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species." 16 U.S.C.S. § 1531(c)(2).

The ESA seeks to promote cooperative federalism in practice by allowing the federal government to enter into "cooperative agreements with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species." *Id.* § 1535(c)(1)(A). The legislative history explains that these agreements were intended to act as "mechanisms through which the Federal government and the governments of the States can work

fruitfully together toward the mutually accepted goal of protection of endangered and threatened species." S. Rep. No. 93-307 (1973). Congress had hoped to "impel the states to develop strong programs to avoid the alternative of Federal preemption." *Id*. To qualify for a cooperative agreement, a state program must meet federal standards. *Id*. § 1535(c)(1)(B) (providing that state programs must be "consistent with the purposes and policies of the [ESA]").

Last year, the FWS entered into a statewide agreement with Florida through that state's Fish and Wildlife Conservation Commission (FWCC). The agreement does not pass down authority as completely as a delegation under the Clean War Act or Clean Air Act, but nonetheless gives the state a significant role in conserving and managing listed species. FWS & FWCC, *Cooperative Agreement Between the United States FWS and the Florida FWCC for the Conservation of Endangered and Threatened Fish and Wildlife* § 2(a)(1) (2012).

While the cooperative agreement with Florida is particularly broad and comprehensive, in practice almost all cooperative agreements between the states and the federal government have been geographically targeted and species-specific. Often the cooperative agreements have come with federal funding (which, in addition to incentivizing states to implement cooperative agreements, would shield the agreements from commandeering claims under the first *New York* prong for quid pro quo federal funding).

The ESA provides that the federal government may supply up to 75 percent of program costs (or 90 percent for species through which coordination among multiple states can provide better protection). 16 U.S.C.S. at § 1535(d)(2).   In fact, all 50 states – including Texas – have accepted funds under § 1535.  Kaush Arha and Barton H. Thompson, Jr., ed., *The Endangered Species Act and Federalism* 11 (2011).   In 2012, for instance, the federal government provided Texas with funds to acquire and protect essential habitats in Bexar and Hays counties for endangered invertebrates, golden-cheeked warblers and black-capped vireos.  FWS, *FY 2012 Cooperative Endangered Species Conservation Fund: Project Description by State* 2, 10 (2012), *available at* http://tinyurl.com/k4qrzhg.   Section 6 funds have been used "extensively" to promote whooping crane recovery in Texas.  FWS, *Spotlight Species Action Plan* 5 (April 7, 2009), *available at* http://tinyurl.com/oncnu88.

The State has accepted federal funds to protect endangered species.  It has not designed the comprehensive program provided for in Section 6 of the ESA. Because the State decided not to avail itself of the option provided for in Section 6, the ESA's constraints now apply.   But their application stems from the State's choice, not from some inescapable form of federal coercion.

**C. Because the State Has Failed to Protect Whooping Cranes According to Federal Standards, the ESA Must Preempt**

The ESA expressly preempts laws that fall short of federal standards and proximately cause the take of endangered species. "*Any* State law or regulation which applies with respect to the … interstate or foreign commerce in … endangered species or threatened species is void to the extent that it may effectively permit what is prohibited by this Act." 16 U.S.C. § 1535(f) (italics added). *See also Strahan*, 127 F.3d at 168; *Swan View Coal. v. Turner*, 824 F. Supp. 923, 938 (D. Mont. 1992); *United States v. Glenn-Colusa Irrigation Dist.*, 788 F. Supp. 1126, 1134 (E.D. Cal. 1992).

A state law regulating the sale of a particular endangered species would obviously be preempted under the ESA. But state laws do not have to expressly address endangered species to be preempted. State conduct – including the enactment or enforcement of state laws – would violate the ESA and be preempted if it proximately caused the take of endangered species. *Sweet Home*, 515 U.S. at 713 (O'Connor, J., concurring) ("In my view, then, the 'harm' regulation applies where significant habitat modification, by impairing essential behaviors, proximately (foreseeably) causes actual death or injury to identifiable animals that are protected under the Endangered Species Act.").

Neither State-level endangered species legislation, Tex. Parks & Wild. Code §§ 83.011–83.020, nor the statutes governing TCEQ's administration of Water

Resources, Tex. Water Code, Title 2, prevent the taking of endangered whooping cranes. Neither provide a degree of protection commensurate with the ESA. Consequently, the district court held that the ESA preempts Texas law and issued its order enforcing Section 9. *Aransas*, 2013 U.S. Dist. LEXIS 33258, at *179.

To remedy the Section 9 violation, the district court instructed the State to apply for an ITP (so that any incidental takes associated with the state's water permitting program would be authorized) and to issue no further water permits for the San Antonio and Guadalupe rivers in the interim. The district court did not require the TCEQ to regulate a previously unregulated sphere of commerce (as with the invalidated radioactive waste provisions in *New York*) or execute tasks on behalf of the federal government (as with local law enforcement gun checks in *Printz)*. Instead, the district court recognized that because the State had chosen to manage water rights – by issuing and enforcing water permits – it had assumed the legal obligations that came with managing a natural resource, including complying with Section 9. *Glenn-Colusa*, 788 F. Supp. at 1134.

In a similar vein, a Wyoming district court held that FWS did not run afoul of the Tenth Amendment when it refused to remove gray wolves in Wyoming from the ESA endangered species list. *Wyoming,* 360 F. Supp. 2d at 1214. Wyoming had presented the FWS with a wolf management plan approved by the state legislature, but FWS deemed the plan inadequate. *Id*. at 1220-23. The state

claimed that the FWS was trying to pressure it into passing certain legislation. *Id.* at 1242. The court concluded that FWS had given the state a legitimate choice: develop a suitable wolf management plan or accept federal preemption and continued listing. *Id.* at 1244.

In at least two cases – *Seattle Audubon Society* and *Strahan* – courts have found that the commandeering doctrine does not bar a court from enjoining states to comply with the ESA. 2007 U.S. Dist. LEXIS 31880 at *38; 127 F.3d at 155. In *Seattle Audubon Society*, a district court prohibited the state of Washington from approving forest practice applications authorizing destruction of ESA habitat until the state had demonstrated that the approvals would not violate the ESA – a form of relief remarkably similar to the injunction in the instant matter against new permits for San Antonio and Guadalupe river water. 2007 U.S. Dist. LEXIS 31880, at *48. The court explained that the "Tenth Amendment does not bar a federal court from ordering state officials to comply with federal law. *Id.* at 43. If the Court finds for Plaintiffs on the merits, it can craft an injunction that orders state officials to stop violating the ESA." *Id.*

The *Seattle Audubon Society* court acknowledged that its equitable powers had limits; it could not instruct a state to take "*positive steps* with respect to advancing the goals of a federal regulatory scheme." *Id.* at 42 (emphasis added). The court drew this notion of positive steps from *Strahan*, which observed that an

27

injunction did not commandeer because a state's regulations were "inconsistent with federal ESA standards" and were therefore preempted by federal ESA provisions  *Id*. at 170.

The *Strahan* court noted that an injunction did not require Massachusetts to take "positive steps" but rather directed it to find a "means of bringing the Commonwealth's scheme into compliance with federal law."  *Id*. at 170.  The opinion did not define "positive steps," though it interchangeably used similar terms such as "positive obligations" and "positive action" and implied that the terms would apply when the federal government "has directed the state to enact a particular regulatory regime that enforces and furthers a federal policy."  *Id*. at 164, 169, 170.  *Strahan* differentiated these "positive" actions from actions requiring a state to bring a state "scheme into compliance."  *Id*. at 170.  In effect, the state in *Strahan* was held liable as the licensor/permitor of a state-owned resource, and the appropriate remedy was "to order the state to either stop issuing the permits or obtain its own ESA permit to continue issuing the permits."  J.B. Ruhl, *State and Local Government Vicarious Liability Under the ESA*, 16 Nat. Res. & Env't  70, 76-77 (2001).  But such an order fell short of "actually ordering the state to regulate its citizens where or to an extent it has not already done."  *Id*. at 77.

In the instant case, the lower court's order for the state to get an individual take permit preserves the state's sovereignty by authorizing future unavoidable

takes, provided the species' long-term survival is not jeopardized. The order does require the State to take certain steps, but those do not amount to positive actions because they do not directly order the State to regulate its residents in a particular fashion. The State must merely achieve a base level of protection for the whooping cranes; the State has tremendous discretion in determining the best means of achieving that protection.

Of course, this Court has recognized before that the commandeering doctrine imposes limits on federal environmental regulation. In *ACORN v. Edwards*, 81 F.3d 1387 (5th Cir. 1996), this Court held provisions in the Lead Contamination Control Act (LCCA) unconstitutional because they required states to disseminate information about water coolers containing lead and to establish remedial programs to remove lead from school drinking water systems. But those provisions are different from both Section 9 of the ESA and the district court's order, because they compelled the states to take affirmative steps to execute specific provisions of federal law. The LCCA provisions required states to develop and maintain specific regulatory programs on behalf of the federal government. Here, the district court's order enjoined the state's violation of the ESA and required that TCEQ apply for an ITP in order to authorize future incidental takes of whooping cranes, but did not require Texas to implement a

specific conservation program for the cranes, or to administer its water permitting program in a particular way.

Another decision – *Abilene* – offers more applicable guidance. There, this Court rejected an as-applied challenge to Clean Water Act stormwater regulations. 325 F.3d at 663. The Environmental Protection Agency (EPA) gave two cities a choice – reduce stormwater pollution through best management practices (BMPs) or numeric end-of-pipe discharge limits. The cities selected the BMPs but argued that implementing them would require regulating third parties within municipal boundaries. This Court found that the choice the EPA had given the cities was valid under *New York* and *Printz*. "It cannot be constitutionally determinative that the federal regulation is likely to move the States to act in a given way, or even to coerce the States into assuming a regulatory role." *Id.* at 662 (quoting *Hodel*). *See also Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 846 n.19 (9th Cir. 2003) (upholding a stormwater regulation that compelled local governments to impose federal minimum measures on upstream dischargers "through ordinance or other regulatory mechanism.").

ESA Section 9 and the district court's order in this case are similar to the stormwater permit conditions in *Abilene* in that they merely require a regulated public entity to meet certain baseline federal standards, even if that means the regulated entity must amend its own regulations to do so.

**CONCLUSION**

For the foregoing reasons, this Court should uphold ruling below and refuse to reverse on Tenth Amendment grounds.

Respectfully submitted,

/s/ Melinda Taylor

Melinda Taylor
Kelly Haragan
Jeremy Brown
*Counsel for Amicus Curiae*

University of Texas School of Law
727 E. Dean Keeton
Austin, TX 78705
mtaylor@law.utexas.edu
512 459 5175

June 7, 2013

# CERTIFICATE OF SERVICE

On this 7th day of June, 2013, a true and correct copy of the foregoing *AMICUS CURIAE* **BRIEF OF LAW PROFESSORS** was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the Fifth Circuit, which currently provides electronic service on the counsel of record.

---

James B. Blackburn, Jr.
Charles W. Irvine
Mary B. Conner
Blackburn Carter, P.C.
4709 Austin St.
Houston, Texas 77004
***Counsel for Plaintiff-Appellee The
Aransas project***

Edmond R. McCarthy, Jr.
Jackson, Sjoberg, McCarthy
& Wilson, LLP
711 West 7th St.
Austin, Texas 78701

David W. Ross
General Counsel
San Antonio River Authority
Law Offices of David Ross, P.C.
115 E. Travis St., Suite 1630
San Antonio, Texas 78205
***Counsel for Intervenor Defendant-
Appellant San Antonio River
Authority***

Kenneth R. Ramirez
Law Offices of Ken Ramirez
111 Congress Avenue, 4th Floor

Jonathan F. Mitchell, Solicitor
General
Office of Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
***Counsel for Defendants-Appellants
State Officials***

Molly Cagle
Evan Young
Carlos R. Romo
Baker Botts LLP
98 San Jacinto Blvd.
Austin, Texas 78701-4078

Aaron M Streett
Baker Botts LLP
910 Louisiana St.
Houston, Texas 77002-4995

Edward F. Fernandes
Christopher H. Taylor
Hunton & Williams LLP
111 Congress Ave., Ste. 1800
Austin, Texas 78701

Austin, Texas 78701
Amy Leila Saberian
Enoch Kever PLLC
600 Congress Avenue, Suite 2800
Austin, Texas 78701
***Counsel for Intervenor Defendant-
Appellant Texas Chemical Council***

Kathy Robb
Hunton & Williams, LLP
200 Park Avenue
New York, NY 10166
***Counsel for Intervenor Defendant-
Appellant Guadalupe-Blanco River
Authority***

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R.25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:      June 7, 2013      s/ Melinda Taylor
                              Melinda Taylor

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

This brief contains 6874 words, excluding the parts of the brief exempted by FED.R.APP.P.32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of FED.R.APP.P.32(a)(5) and the type style requirements of FED.R.APP.P 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman style.

s/ Melinda Taylor

Melinda Taylor
Counsel of Record for *Amicus Curiae*
Law Professors
June 7, 2013